WELLS, FARGO & Co. *v.* OREGON RY. & NAV. **Co.**

(*Circuit Court, N. D. California.* August 8, 1887.)

1. SALE—JUS DISPONENDI—LIABILITY OF CARRIER FOR MISDELIVERY.
   Where a shipper attaches his bill of lading to a draft upon the consignee, he thereby expresses his intention to deliver the goods upon payment of such draft, and to retain control of them until such payment, and the carrier who, under such circumstances, delivers them while in transit to the shipper, is liable to the consignee who has duly taken up the draft.

2. DAMAGES—EXPENSE INCURRED IN PURSUIT OF PROPERTY—EVIDENCE.
   Under Civil Code Cal. § 3336, providing that, in an action brought by a consignee against a carrier for wrongfully delivering up goods in transit to a party other than the consignee, the measure of damages shall be the highest market value of the property at any time between the conversion and the verdict, without interest, and a fair compensation for the time and money *properly* expended in pursuit of the property, it is incumbent on the plaintiff to show the circumstances under which the expenditure claimed by him to have been incurred was made, so that the court can decide whether it was proper.

*Page & Eells,* for plaintiffs.
*Estee & Wilson* and *Messick & Maxwell,* for defendant.

Ross, J. From August, 1885, to some time in the early part of 1886, the firm of Mills & Co. and one William Jones were dealing largely in wheat; Mills & Co. being located in San Francisco, California, and Jones at Walla Walla, Washington Territory. During the same period the plaintiffs herein were carrying on business as bankers in San Francisco, and defendant was engaged in the transportation of passengers and freight between various points in Oregon, Washington Territory, and California. At different times between the dates mentioned Jones sold wheat to Mills & Co. In doing so, the method adopted—except in one instance, which occurred early in their dealings, and which it is not important to notice further—was this: The respective parties would, by telegram or letter, agree upon a sale, whereupon Jones would ship the wheat on the defendant's cars, taking therefor a carrier's receipt, reciting defendant's agreement to deliver the merchandise to consignee or owner; Mills & Co. being therein designated as consignees. Jones would then draw a draft on Mills & Co. in the approximate amount of the purchase price,—not exceeding, however, according to the agreement of the parties, 95 per cent. thereof, in order to guard against shortage or damaged wheat; attach to it the carrier's receipt; discount the same with Baker & Boyer, bankers of Walla Walla, who would send the draft, with annexed receipt, to the First National Bank of San Francisco for acceptance and collection. That bank, on receipt of the papers, would notify Mills & Co. of their arrival; and Mills & Co. would accept the draft, and, on maturity, pay it with their check on Wells, Fargo & Co., duly certified; the check being certified and paid by Wells, Fargo & Co. pursuant to an agreement between them and Mills & Co. that they would advance the money upon the carrier's receipt, which, in each instance, was indorsed and delivered by

Mills & Co. to them. It was further understood between Mills & Co. and Wells, Fargo & Co. that the receipts should also stand as security for a general balance standing against Mills & Co. on the bank's books. Up to and including January 11, 1886, Jones had in this manner shipped and sold to Mills & Co. in the aggregate, 190,000 bushels of wheat, all of which was delivered by defendant to the order of plaintiffs. Subsequent to, but soon after, January 11th, the wheat in controversy in the present action was shipped by Jones, through defendant, to Mills & Co.; the carrier's receipts, in the same form as those previously given, (except that in one, for 390 sacks, Mills & Co., care of Taylor, Young & Co., Portland, Oregon, and in another, for 310 sacks, Mills & Co., Portland, were named as consignees,) were taken by Jones; drafts were drawn by him on Mills & Co. in the approximate value of the wheat; the carrier's receipts attached to them; and sent through Baker & Boyer to the First National Bank of San Francisco for acceptance and collection. These drafts were accepted by Mills & Co., and paid in the same way, and upon the same agreement, as the previous drafts; that is to say, with money advanced by Wells, Fargo & Co. upon the security of the carrier's receipts, which, as in the previous instances, were indorsed and delivered by Mills & Co. to them.

Of the wheat sued for, numbering in all 5,363 sacks, 1,023, it was proved on the trial, were properly delivered by defendant in San Francisco; and as to that lot, plaintiffs, on the hearing, conceded that they had failed to make good their claim. The remaining 4,340 sacks were never delivered to plaintiffs, and for those they contend they are entitled to recover.

After the wheat in controversy had been shipped in the manner stated, Jones came to San Francisco; and finding Mills & Co. insolvent, and that he had not been paid in full for the wheat sold and delivered prior to January 11, 1886, stopped in transit all of that in controversy, except the two lots consigned to Portland. Of those lots, that embracing 310 sacks, and consigned to Mills & Co., Portland,—at which place there was no such firm,—was upon request of Jones delivered by defendant to Caesar & Co. for Jones, and by him received; and that embracing 390 sacks, and consigned to Mills & Co., care of Taylor, Young & Co., Portland, was delivered by defendant to Taylor, Young & Co., at Portland, for Jones, and by him received. The remaining 3,640 of the 4,340 sacks yet in dispute were delivered by defendant directly to Jones, pursuant to notice given to, and demand made on, defendant by Jones, to the effect that he was the owner of the wheat, had not been paid for it, and that the consignees (Mills & Co.) were insolvent.

For the defendant nominally, but in reality for Jones,—he being the real party in interest,—it is contended that Jones contracted to sell Mills & Co. 190,000 bushels of wheat, the ownership of which passed to them at the time the wheat was delivered to the carrier, and for which he has never been paid in full; that the wheat in controversy was shipped by Jones through the mistake of his clerk "in running up figures;" that the drafts drawn by him on Mills & Co. were not drawn against any specific

shipment of wheat, but against his general account; and that the money of the plaintiffs that went to pay the drafts that accompanied and were annexed to the carrier's receipts for the wheat in controversy, and which was advanced upon the security of those receipts, was properly credited by Jones to the general account of Mills & Co., which still left a small balance due for the 190,000 bushels,—from all of which the deduction is attempted to be drawn that the wheat in controversy was never sold by Jones to Mills & Co., and that neither that firm nor the plaintiffs ever acquired any property or interest in it.

Although Jones, in his testimony, and his counsel, in their argument, frequently speak of a contract between Jones and Mills & Co., by which he agreed to sell them 190,000 bushels of wheat, the case clearly shows that no such contract was ever made. There were a series of contracts made between the parties for the sale by Jones to Mills & Co. of wheat, between August, 1885, and the eleventh of January, 1886, which, up to and including the last-mentioned day, aggregated 190,000 bushels. In no instance, however, was the sale consummated, as is argued by counsel for Jones, when the wheat was delivered to the carrier, but only when the draft that was drawn against the wheat was paid. Whether the property passes to the vendee upon delivery to the carrier depends upon the circumstances of the particular case. It never does when the vendor manifests the intention to retain the *jus disponendi.* In respect to the sales in question, that intention was clearly manifested by the fact that the vendor attached the carrier's receipts to the drafts, and deposited them with bankers who discounted the drafts; and this, as he himself testified, was purposely done *"for his own security,"* and because he "wanted to know that they [Mills & Co.] would not get the receipts until they had paid the drafts." See Benj. Sales, (4th Ed.) §§ 381–399, and authorities there cited.

In view of these facts, no importance can be attached to the further statement of Jones that he did not draw against any specific shipment, but against his general account. He drew against the wheat in controversy, and attached to the drafts the shipping receipts therefor, in precisely the same way that he did in respect to the wheat shipped prior to January 11th; the evident purpose, and, indeed, the admitted purpose,— since it was done "for his own security,"—being to retain the ownership of the wheat until payment of the draft against it. It is not pretended that any of the wheat was shipped to Mills & Co. on commission; for Jones himself testified: "I did not intend to send them any I did not sell them." I can discover no distinction in the dealings of the parties between the shipments made prior and those made subsequent to January 11, 1886. Nor do I see how the statement that the wheat in excess of 190,000 bushels was shipped through the mistake of the clerk "in running up figures," can be reconciled with the undoubted fact that there never was a contract for 190,000 bushels, but a series of contracts, made by an offer on Jones' part to furnish a certain number of bushels, and an acceptance on the part of Mills & Co. to take the number mentioned at a given price; nor with the further fact that on the *sixteenth* of

January, after 190,000 bushels had been shipped and sold, Jones wrote to Mills & Co.: "I wired you last night, asking you if I was safe in buying on the basis of the last figure, 53;" and in the same letter notified them that he had drawn on them for $1,550, for 1,484 sacks, the same being a part of the wheat in dispute. In my opinion, all of the wheat in controversy, that is to say, 4,340 sacks, was sold by Jones to Mills & Co., and the ownership of the respective lots passed to them upon the payment of the respective drafts. That being so, there can be no doubt, in view of other undisputed facts, that the title to the wheat vested in the plaintiffs. *Bank of Rochester* v. *Jones*, 4 N. Y. 497. The extent of their interest therein need not be considered in this case.

It results from these views that, as to the 3,640 sacks, certainly, defendant was not justified in the delivery to Jones, and is consequently responsible to plaintiffs for the conversion. So, also, I think, is defendant responsible for the 390 and 310 sacks delivered to Taylor, Young & Co., and Caesar & Co., respectively. In each instance, without requiring the surrender of the shipping receipts which it had issued, and which it was shown at the trial were always treated by the company as negotiable, defendant delivered the property to others than those claiming under that title. For such misdelivery it must answer to the true owner. *The Thames*, 14 Wall. 107; *City Bank* v. *Railway Co.*, 44 N. Y. 141.

It only remains to consider the question of damages. By virtue of section 3336 of the Civil Code, plaintiffs are entitled to recover the highest market value of the property at any time between the conversion and the verdict, without interest, and a fair compensation for the time and money properly expended in pursuit of the property. The most satisfactory testimony in regard to the highest market value reached by Walla Walla wheat since February, 1886, is that of Sinclair, who fixes it at $1.58¾ per cwt.; and that value will be allowed, less freight at the rate of $8.70 per ton. Kavanaugh's testimony in regard to the highest value is too speculative. The evidence is insufficient to show that plaintiffs properly expended anything in pursuit of the property. The only evidence on that point is that of Wadsworth, cashier of plaintiffs, who was asked: "*Question.* Have you paid out anything in the pursuit of this property? *Answer.* We paid some fees, yes, sir; and some costs. *Q.* To what amount? *A.* My recollection is, $650,—we paid a fee; and about $50 costs. *Q.* $650 fees for what? *A.* Attorneys." It devolves upon the plaintiffs to show the circumstances under which the payments were made, so that the court may determine whether the money was *properly* expended or not.

Counsel for plaintiffs will prepare findings in accordance with this opinion, submit them to opposite counsel for such suggestions as they may think proper to make, and then to me for settlement.