## MIDLAND NATIONAL BANK v. MISSOURI PACIFIC RAILWAY COMPANY, *Appellant*.

### Division One, February 18, 1896.

1. **Railroad:** BILLS OF LADING: DUPLICATES: LIABILITY OF CARRIER. Where a railroad company issues original bills of lading declaring that the consignment is in its possession to be delivered only on their presentation, and not conditioned to be void in case of delivery on duplicate bills issued by the railroad, the latter will be liable on its original bills to one holding them as indorsee for a valuable consideration, though it previously delivered the consignment to the shipper on his presenting one of the duplicate bills.

2. **Bills of Lading:** COLLATERAL SECURITY. The surrender by holder of bills of lading held as collateral security for a loan is a good consideration for the substitution, as security, of new bills of lading antedating the loan.

3. ———: CARRIER: CONSIGNEE: CUSTOM. A custom requiring the consignee to take possession of the consignment within six days after notice of the arrival *held* not to release the carrier from liability on failure to deliver to the holder of the original bill of lading.

*Appeal from Jackson Circuit Court.*—HON. J. H. SLOVER, Judge.

AFFIRMED.

*Elijah Robinson* for appellant.

(1)   The jurors being the sole judges of the credibility of witnesses and of the weight of the evidence, it was their province, and not that of the court, to pass upon the credibility of the witnesses for plaintiff and the weight to be given to their evidence, and in giving said peremptory instruction the court invaded the province of the jury.   *Bryan v. Wear*, 4 Mo. 106; *McAfee v. Ryan*, 11 Mo. 365; *Steamboat v. Matthews*, 28 Mo. 240; *Bradford v. Rudolph*, 45 Mo. 426; *Gregory v. Chambers*, 78 Mo. 298; *Kenney v. Railroad*, 80 Mo. 573; *Myers v. Trust Co.*, 82 Mo. 238; *Hipsley v. Railroad*, 88 Mo. 348; *Church v. Railroad*, 119 Mo. 203; *Hill v. Scott*, 38 Mo. App. 375; *Wilson v. Railroad*, 120 N. Y. 151.   (2)   The court should have sustained the demurrer to plaintiff's evidence, offered by the defendant.   It is a well settled principle of law that the purchaser of a bill of lading acquires only the title to the property, thereby represented, which the vendor had at the time of the sale.   *Skilling v. Bollman*, 6 Mo. App. 76; *Skilling v. Bollman*, 73 Mo. 665; *Railroad v. McLiney*, 32 Mo. App. 166; *Bank v. Railroad*, 42 Mo. App. 284; *Dymock v. Railroad*, 44 Mo. App. 400; *Dickson v. Elevator Co.*, 44 Mo. App. 498; *Weyand v. Railroad*, 75 Iowa, 573.   (3)   If the delivery of the property to the shipper, to whose order it was consigned, was made while it was still the owner of the property, then the undertaking upon the part of the defendant was accomplished and it was thereby discharged from any further obligations.   See authorities last above cited.   Also Porter on Bills of Lading, secs. 457, 495; *Glyn v. Dock Co.*, L. R. 7 App. Cas. 591.   (4)   The authorities even go so far as to hold that where bills of lading are issued in sets the carrier may

deliver the goods to the party named as consignor, even though the consignment be to the shipper's order upon the surrender of any one of the set of bills of lading.    See cases last above cited.    Porter on Bills of Lading, sec. 495.

*Lathrop, Morrow, Fox & Moore* for respondent.

(1) The rule is now well established, that where, as in this case, the evidence is uncontradicted, or where a verdict for an adverse party would be set aside, it is the duty of the trial court to direct a verdict. *Morgan v. Durfee*, 69 Mo. 469; *Jackson v. Hardin*, 83 Mo. 185; *Fitzgerald v. Barker*, 96 Mo. 666; *Landis v. Hamilton*, 77 Mo. 554; *Powell v. Railroad*, 76 Mo. 80; *Reichenbach v. Ellerbe*, 115 Mo. 595; *Clough v. Holden*, 115 Mo. 364; *Boland v. Railroad*, 36 Mo. 491; *Magoffin v. Railroad*, 102 Mo. 543; *Railroad v. Bank*, 123 U. S. 727; *Robertson v. Ederhoff*, 132 U. S. 614; *Railroad v. Converse*, 139 U. S. 472; *Beckman v. Coal Co.*, 58 N. W. Rep. 889. (2) Plaintiff is a *bona fide* holder, for value, of the bills of lading sued upon, notwithstanding the bills taken by plaintiff were subject to change. (3) The plaintiff, upon transfer by indorsement of the bills of lading, is to be taken as the owner of the property represented thereby; and the defendant, having failed to make delivery of said property on demand, is liable for the value thereof. *Colgate v. Perin Co.*, 6 N. E. Rep. (N. Y.) 114. (4) The defendant, in wrongfully permitting *quasi* negotiable instruments, such as bills of lading, to be put afloat is, on the principle of equitable estoppel, precluded from questioning their validity. 18 Am. and Eng. Encyclopedia of Law, pp. 610, 627, 629, 634, 641; *Bank v. Bank*, 71 Mo. 183; *Lee v. Turner*, 89 Mo. 489; *Neuhoff v. O'Reily*, 93 Mo. 164; *Cowdery v. Vanderburgh*, 101 U. S. 572;

*Moore v. Bank*, 55 N. Y. 41; *McNeill v. Bank*, 46 N.
Y. 325; *Davis v. Bechstein*, 69 N. Y. 442; *Combes v.
Chandler*, 33 Ohio St. 178; *Horn v. Cole*, 51 N. H. 287;
*Bank v. Phoenix Co.*, L. R. 5 Ch. Div. 217; *Goodwin
v. Roberts*, L. R. 10 Ex. 76; *Herrick v. Atwood*, 25
Beav. 205; *Briggs v. Jones*, L. R. 10 Eq. 92. (5) By
the universal practice in the commercial world, as well
as by the uniform and general custom in Kansas City,
the original bill of lading is the representative of the
goods, and the duplicate bill is merely a memorandum
of the shipment. It is a common expression that the
original bill "carries the goods." *Forbes v. Railroad*,
133 Mass. 154; *Bank v. Logan*, 74 N. Y. 568; *Glyn v.
Dock Co.*, L. R. 7 App. Cas. 598. (6) Evidence as
to the dates of the bills of lading and as to the length
of time grain customarily stood upon the tracks before
being unloaded or reshipped is immaterial to the issues
in this case. The custom above mentioned being
shown, that constituted a guarantee to the plaintiff
or anyone dealing with the bills of lading, that the
bills were "live" bills; that the grain was in the pos-
session of the railroad company and would be deliv-
ered to the proper person. There was then no occa-
sion or obligation on the part of the plaintiff to exer-
cise vigilance in respect to the dates. By its custom
the defendant disarmed the plaintiff. (7) A judg-
ment will not be reversed for error in the giving or
refusing of instructions, or in the admission or rejec-
tion of evidence, unless such error materially affects
the merits of the action. *Henry v. Railroad*, 113 Mo.
538.

ROBINSON, J.—This is an action by the Midland
National Bank of Kansas City, as pledgee of twenty
bills of lading issued by the Missouri Pacific Railway
Company, against said railway company, for failure to

deliver to it the twenty car loads of grain covered by the bills of lading.

The petition contains forty counts, every consecutive odd and even count thereof being based upon the same bill of lading, and all substantially the same, with the exception of the description as to the particular character of grain in each car, its value, and the car number containing same.

The case was tried by a jury, and, after the testimony was all in, the court directed the jury to return a verdict for plaintiff, for which alleged error on the part of the trial court this appeal is chiefly prosecuted.

The following are the substantial averments of plaintiff's petition: "That during the months of September and October, 1891, defendant received the cars of grain at Paola, Kansas, consigned to the order of the shipper at Kansas City, Missouri, and the issuance by defendant of shipper's order bills of lading, covering each car separately; that the various cars of grain, by the terms of these bills of lading, were to be delivered to the order of the Courier Commission Company, at Kansas City, Missouri; that the commission company negotiated a loan of plaintiff, and pledged the twenty original shipper's order bills of lading, duly indorsed, as collateral security for said loan; and that plaintiff presented said bill of lading to defendant, and demanded the grain called for in said bills, which was refused, to plaintiff's damage to the value of the grain," etc.

In each of the even numbered counts of the petition plaintiff set out, in addition to the above facts, the existence of a general custom in Kansas City, in all cases when grain is shipped to that city on bills of lading similar to those herein mentioned, where delivery is to be made to shipper's order, for the railway companies, on the delivery of such grain, to take

up such bills of lading, and that such custom was at all times known to defendant; and that during all said time a general custom had obtained in Kansas City of loaning money upon the security of grain in the hands of the railroad companies on bills of lading similar to these sued on here, when grain is to be delivered to shipper's order, and of receiving such bills of lading as evidence of the ownership of said grain, which custom was known to defendant; and that, in accordance with, and relying upon, such custom, the plaintiff made the loan to the Courier Commission Company, and that, by reason of the custom, defendant became obligated to deliver said grain to plaintiff on the production and offer to surrender the original bills of lading so issued by it, and is now estopped trom refusing so to deliver said grain, etc.

In our view of the law governing such instruments and the rights of indorsers thereunder, the matter of custom so set up in the plaintiff's petition, as well as the countervailing custom pleaded by defendant in its answer, will count for but little in the determination of the real issues involved; and in eliminating them now, as factors not to be considered, many minor questions raised by defendant, as to alleged error of the trial court in admitting and excluding testimony offered on those questions, are made of no consequence, as its admission or exclusion could affect only nonessential issues raised by the pleadings.

Defendant, in its answer, admitted the execution and delivery of the bills of lading sued on to the Courier Commission Company, and that the commission company, by indorsement in writing, had transferred same to plaintiff before the institution of this suit, and that plaintiff was now the holder, and in possession, of same, and had made demand upon it for the grain called for in the bills of lading in suit,

and that it refused to deliver same to plaintiff, but denied that plaintiff had purchased and paid for same, as alleged in its petition.

And, further answering, alleged that, when the grain mentioned in the bills of lading sued on was delivered to it for shipment, it issued bills of lading in sets, that is, three bills of lading for each car, and that, soon after the issuance of the bills, it in good faith delivered the grain covered by said bills of lading to the owner thereof, the Courier Commission Company, on the surrender to it of one set of said bills of lading by the Courier Commission Company; that, subsequent to the delivery of said grain by it to the commission company, the plaintiff obtained possession of the bills of lading sued on, and that, at the time it got possession of same, it knew, or by the exercise of ordinary care, caution, and prudence, could have ascertained, that the grain called for in said bills of lading had been delivered by defendant to the commission company, and that said bills were no longer valid; that, at the time when said bills of lading were received by plaintiff, there was, and for a long time prior thereto had been, prevailing in Kansas City, among all the railroad companies which were then in the habit of shipping grain into Kansas City, and particularly with the defendant, a custom whereby the owner of grain so shipped to said city was required to receive and take possession of the same within six days after its arrival in said city, and that said plaintiff, when it received said bills of lading, was aware of such custom, and must have known, if it had exercised reasonable care and diligence, that said grain had, long prior to that time, been delivered to the owner thereof; further, that, upon the grain being delivered to the commission company by defendant, said company shipped same to other points, and received from defendants and other railroad companies

in Kansas City bills of lading therefor, and that afterward the commission company attached said bills of lading to drafts, and delivered the same to plaintiff, who caused said grain to be sold, and received the proceeds thereof.

Plaintiff then filed its reply, alleging the existence in Kansas City of a general custom that shipments of grain and other property consigned to and arriving in Kansas City, billed to the order of the shipper, were deliverable only upon the production, surrender, and cancellation of the original shipper's order bills of lading; and that if any delivery of the grain in controversy was made by the defendant to the Courier Commission Company, it was made without the production, surrender, and cancellation of the original shipper's order bill of lading, in violation of said custom upon which plaintiff relies; and that defendant, by reason of the premises, was estopped from claiming or showing a delivery without the production and surrender of the original shipper's order bill of lading—coupled with a general denial of new matter set up in the answer, etc.

The question as to the good faith of the defendant in the matter of the delivery of the grain in controversy to the Courier Commission Company, or that, by the exercise of ordinary care and prudence on part of plaintiff, it might have been able to have ascertained the fact regarding the delivery of the grain by defendant to the Courier Commission Company, is in nowise controlling, and can not be used to defeat plaintiff's right of action as holder for value. The rights of the parties to this litigation must be determined by the contract of affreightment issued by the defendant company to the Courier Commission Company, unless the plaintiff, or some holder of the bills before it, has done something, with the knowledge of plaintiff, whereby

defendant was discharged from its obligation; and no custom practiced and maintained by the defendant and other railway companies at Kansas City can prevail, against the express language of their contract of affreightment, to affect the rights of the holder by indorsement thereof, or in anywise limit the liability of the defendant thereon, unless such custom had been exercised, and plaintiff had purchased or received the bills with the knowledge of that fact.

The fact that a rule was in force among the railroads at Kansas City at the time of this transaction, and further, that, from its general enforcement and practice, a custom had thereby been established, that was known to plaintiff, to the effect that grain and produce shipped to Kansas City were to be received by the consignee within six days from the date of its arrival on the tracks there, would not excuse or justify the misdelivery of the goods by defendant, or relieve against the express language of the contract of affreightment to deliver to the "shipper's order." If the plaintiff did nothing to mislead defendant, it had the right to rely upon the fact that it held the bills of lading, and that, according to the ordinary course of business, the grain could not be obtained except upon their production. The custom pleaded by defendant could do nothing more than impose upon the consignee or the holder of the bills by indorsement the expense of paying for the storage of the grain after the sixth day of the arrival of same at Kansas City, and could in no sense be said to operate, influence, or control the question of the delivery and disposition of the grain to other than the rightful owner, except for storage purposes. In other words, the question of where defendant might store the grain, and what burdens he might impose on it, after the sixth day of its arrival, and non-acceptance by the owner, according to a prevailing

custom at Kansas City, in no way affects or controls the question as to who is entitled to the grain, or the question as to whom defendant had contracted to deliver the grain under the bills of lading issued by it.

Nor can the fact that the defendant in good faith delivered the grain covered by the bills of lading in suit to the commission company, knowing that they were the original shippers and consignees named in the bills of lading, as they had oftentimes done before, on surrender of the duplicate bills of lading merely, avail defendant anything in this action, if the bank, the holder by indorsement and assignment of the original bills of lading, were ignorant of the fact. If the defendant, trusting to the former fair dealing and integrity of the commission company, saw fit to deliver to it, or to rebill the cars of grain to other points for the commission company, and issue other bills of lading for same, without requiring the production of the original bills of lading issued at Paola, Kansas, and now held by plaintiff, it took the risk of the truthfulness of the Courier Commission Company's statements as to who was the owner of the grain, and can not now avoid it, and lay his burden upon the shoulder of the bank, unless it can further show that the bank did something to deceive it, and led it into the error it committed in thus delivering the grain to the Courier Commission Company.

By the admissions of the defendant in its pleading, supplemented by the positive proof of its witnesses, the plaintiff was the holder for value, by written indorsement thereon and the delivery thereof, of the bills of lading sued on; and, if so, then the admission by pleading, supplemented by defendant's own testimony, fixes its liability, and it was the duty of the court to give legal effect to such facts by instruction, and the jury were only left to ascertain the amount of the lia-

bility, as was done in this case.    If plaintiff is the holder by indorsement of the bills of lading, then it owned the grain covered by them, and defendant can not excuse itself by saying that plaintiff did not present its bills in a reasonable time, and that, by reason of that fact, it turned over the grain to the consignee on the simple surrender of its duplicate bills, or rebilled same to other points, without the production, surrender, or cancellation of the original "shipper's order bills of lading."

Defendant next contends that the notes held by the bank show upon their face that the money represented by them had been advanced by the bank to the Courier Commission Company long prior to the time when the bills, or a part of them, at least, were or could have been received by the bank, and that, as a consequence, the money could not have been advanced on the faith of the bills of lading in suit, as alleged in plaintiff's petition; which, in a limited sense, is true, but not in the sense that it was taken as collateral security for an antecedent preexisting indebtedness.

The testimony of the officers of the bank, as well as Mr. Courier, of the Courier Commission Company, called in behalf of the defendant, was that these bills of lading were delivered as security, under an agreement between the bank and the commission company that advancements would be made by the bank, from time to time, to the commission company, as its necessities would require; or that they were given in exchange for like collateral that had been previously deposited with the bank for money advanced.

The fact that there was a change in the collateral, some of the bills of lading being withdrawn, and part of those in suit being put in their place, will not alter plaintiff's relation to them, or his rights of action thereon as against defendant.    The surrender of a for-

mer set of bills of lading was a consideration for the pledge of those in suit, so taken in exchange therefor, and the plaintiff continues to be a *bona fide* holder for value of the substituted bills, although antedating the loan secured.

The rule is stated thus in Colebrooke, Collateral Security, section 15: "The exchange or substitution of other securities for those originally delivered as collateral, has no effect upon the rights of the pledgee, as founded upon the original contract. The surrender of the securities originally deposited is a valuable consideration for the giving of the new securities, and the pledgee is as to the latter a holder for value, in the usual course of business. Such exchange and substitution is sometimes of the utmost benefit to the pledgor, and is supported as against creditors, for the reason that they are not harmed thereby. Even after a pledgor is known to be insolvent, such exchange and substitution of securities is valid, if made *bona fide*, the pledgee receiving securities of no greater value than those surrendered."

While it is true, as contended by appellant, that, as these bills of lading were issued in the state of Kansas, this cause is not to be determined by the provisions of our statute affecting such instruments, it is not true, as further contended by appellant, that, by the rules of the common law, where bills of lading are presented by the person therein named as the party to whom the goods are to be delivered, the delivery to such person is valid, although the party presenting the bills is the holder of only the duplicate or triplicate set of bills, and the original had been surrendered to a *bona fide* pledgee or purchaser for value.

Our statute not only provides that bills of lading are made negotiable by written indorsement thereon and delivery thereof, in the same manner as bills of

exchange and promissory notes, but, to the demands of the business and commercial world, went a step further, and provided "that no prescribed or written condition, clause, or provision inserted in, or attached to, any such bills of lading or contract shall in any way limit the negotiability, or affect any negotiation, thereof, nor in any manner impair the rights and duties of the parties thereto, or persons interested therein; and every such condition, clause, or provision purporting to limit or affect the rights, duties, and liabilities created or declared in the chapter shall be void, and of no force or effect,"—thus making it unavailing to the carriers to issue bills of lading with such clauses and conditions as have been incorporated in many heretofore issued, and in the consideration of which courts have announced propositions similar to that announced by appellant; and those rulings and utterances of the court in turn have been taken, in many instances, as the general doctrine governing such instruments, and the rights and duties of the parties thereunder, in cases when the conditions and obligations under the bills of lading have not been restricted or conditional, as in the original case that gave birth to the oft quoted doctrine.

Numerous cases may be found where the doctrine is announced in a general way that, when goods are shipped under bills of lading drawn in parts, to be delivered to the consignee or his order, or assigns, the carrier is justified in delivering to the consignee, on production of part of the bill of lading, although there has been a prior indorsement for value to the holder of another part, provided the delivery be *bona fide*, and without notice or knowledge of such prior indorsement; and we have been referred to the case of *Glyn, Mills, Currie & Co. v. East & West India Dock Co.*, L. R. 7 App. Cas. 591, decided by the house of lords,

wherein all the judges rendered separate opinions, and reviewed quite fully the most prominent adjudications on that subject for the past century, in their court, as well as many of the other English appeal courts, as sustaining defendant's contention.

While Lord SELBORNE, L. C., in that case says: "It is clear * * * that the shipowner may be discharged by a *bona fide* delivery, under the terms of his contract with the shipper, to a person who is not the true owner; and I think there is no sufficient reason for refusing him the benefit of that contract, when the part of the bill of lading on which he makes a like *bona fide* delivery is not indorsed,"—it must be borne in mind the nature and condition of the contract he is construing, and the contention of the parties to that litigation.

This was a suit for damages by bankers in London —to whom the shipper had indorsed in blank the bill of lading marked "First" of a set of three bills affirmed by the master, all of the same tenor and date, with this condition inserted therein: "The one of which bills being accomplished, the other to stand void"—against a dock company (to whom the goods had been turned over for storage) for delivering them to the shipper on his presenting the bill marked "Second," not indorsed; the bill marked "First" having before that time been duly indorsed for value to the bank, but not known to the shipowner or the dock company, who held the goods for him. The same learned judge, elsewhere in his opinion, uses this language, that clearly indicates the governing consideration in the mind of the court while using the general language above quoted:

"It is for the benefit of the shipper that the right to take delivery of the goods is made assignable, and it is for the benefit and security of the shipowner that when several bills of lading, all of the same tenor and

date, are given as to the same goods, it is provided that the 'one of these bills being accomplished the others are to stand void.' It would be neither reasonable nor equitable, nor in accordance with the terms of such a contract, that an assignment, of which the shipowner has no notice, should prevent a *bona fide* delivery under one of the bills of lading, produced to him by the person named on the face of it as entitled to delivery (in the absence of assignment) from being a discharge to the shipowner.''

And again, to show the question prominent before the court in that case, we will quote from the opinion delivered by Earl CAIRNS at the same time, and in the same court:

''Then what has the shipowner to do? The shipowner has to protect himself from that which is liable to cause difficulty or embarrassment to him, and the way in which as it appears to me he does protect himself is by stating that although 'the master or purser hath affirmed to three bills of lading,'—that is to say, has signed three bills of lading, 'all of the same tenor and date,' yet notwithstanding that fact 'one of these bills of lading being accomplished the others shall stand void,' which I understand to mean that if upon one of them the shipowner acts in good faith he will have 'accomplished' his contract, will have fulfilled it, and will not be liable or answerable upon any one of the others. If one is produced to him in good faith he is to act upon that and not to embarrass himself by considering what has become of the other bills of lading. That appears to me to be the plain and natural interpretation of these words, having regard to the purpose for which they are introduced.''

Thus it will be seen that, while there are authorities using the exact language as used by defendant in its assertion as to the correct rule governing the duty,

liability, and responsibility of the carrier to the holders
of bills of lading issued by it, there must always be
kept in mind the peculiar phraseology of the instru-
ment to be construed.

Much of the conflict of the courts on this subject
has been due to an attempt to apply the rule announced
in a particular case to the general doctrine governing
bills of lading. In the case just referred to the bills of
lading bore this *caveat* and contract on each of the sets
issued: . "The one being accomplished, the others to
stand void,"—thus furnishing an ample beware to the
money loaner, and at the same time a full protection
by contract to the carrier. Under such circumstances,
the carrier, in delivering the goods, on production and
surrender of either one of the sets of three bills of
lading issued, performed his contract, which was in
that particular a restriction and limitation on the other-
wise negotiable and assignable character of such instru-
ment, which, until prohibited, as in this and many
other of the states, by statute, was permissible and
lawful. In the present case no such contract appears
in the bill of lading issued by defendant, and no such
qualifying words restrict its negotiability.

We think the right of the holder by indorsement
for value of an original bill of lading goes much further,
in a contest like this with the carrier, than was
announced by this court in the case of *Skilling v. Boll-
man*, 73 Mo. 665, cited and so much relied on by
defendant. In that case the court simply declared that,
when triplicate bills of lading had been executed by
the carrier to the order of the shipper, of which two
were delivered to the shipper, and one of the delivered
bills of lading has been indorsed to the plaintiff for
value before the shipper sold and delivered the goods
covered by it to defendant, the plaintiff should recover
against the defendant the value of the goods, his bill

of lading being prior to defendant's purchase and receipt of the goods from the shipper. That case involved simply the question of priority of rights between two independent purchasers of property, or the purchasers, in one case, of the symbol or representative of the property, and the purchase of the property itself.

While that case was properly decided it does not reach the facts of this case. Then it was a question of the priority of right between two parties in nowise connected with, or responsible for, the issuance of the bill of lading. Here a different principle is involved. The contest is between the defendant company, who issued and gave life to, and set afloat, this bill of lading, and the plaintiff, the holder of it by indorsement for value.

The question as to whether defendant disposed of the grain before plaintiff purchased the bills of lading can effect nothing, except for showing plaintiff's knowledge of the fact, and his bad faith in the purchase thereafter. After plaintiff had dealt with the commission company upon the legal assurance, as declared in the bills of lading now held by it, that the grain was in defendant's possession, to be delivered only on the presentation of the shipper's order bill of lading, and had given credit and advanced money on the strength of the announcement and contract therein made by the defendant, it is inequitable that defendant could be now heard to say: "I have delivered the grain to the consignee," in violation of law and of the customs prevailing in Kansas City regarding the surrender and delivery of such property.

While bills of lading before the adoption of our statute were not negotiable in the full sense as notes and bills of exchange, still, by the words "consignee, or order, or assigns," an authority to dispose of it by

indorsement was manifest on its face, and a person or company who issues it ought, on all principles of estoppel, to be denied the right to be heard, as against the holder, to say: "True, we made and promised to deliver to the consignee, or his order or assign, but a misdelivery has happened to us by trusting to the word of the consignee, and we ought not now to suffer."

Applying to this case the familiar principle "that where one of two innocent persons must suffer by the act of a third, he should suffer who, by his conduct, has made it possible that the damage should be sustained," how would it affect the parties to this litigation? Assuming that both are equally innocent, the blame must fall on defendant, because it was its act in failing to comply with its duty that made it possible that plaintiff should have invested its money in bills of lading which defendant now seeks to dishonor.

In issuing these bills of lading, defendant said to the business and commercial world: "We hold twenty cars of grain, delivered to us by the Courier Commission Company, which will be retained by us for the company or its assigns, by indorsement in writing, and none of the grain therein will be delivered to anyone except on the surrender and cancellation of those bills of lading." And now, after thus announcing to the world these facts by the issuance of its bills of lading, which are symbols of the property in its custody, and the muniments of title thereto in the hands of the holder thereof, can it afterward say to the holder of these symbols, which represent and stand for the property itself: "True, we said that we had the property, and that we would hold it subject to be delivered only to the holder of the instruments issued by us, but we ought not now to be held to that agreement, because we have carelessly, but in good faith, delivered the same to the original shipper;" or, what is the same, at

its request rebilled the grain to another point without this state, not requiring the production, surrender, and cancellation of the original shipper's order bills of lading; or, what is equally untenable as an answer, "because you [the plaintiff], as holder of those bills, did not present them as soon as the grain reached Kansas City."

If, under ordinary circumstances, the failure to present, on the part of the holder, bills of lading indorsed as in the case of the ones in suit, to the carrier within a reasonable time after the cars containing the property have reached their destination, would have authorized the delivery of the property to the original shipper—which is not true—still, under our statutes, full and ample provision is made to cover just such a condition of things by section 6806 of the Revised Statutes, which provides that "when any goods, merchandise, or other property shall have been received by any railroad * * * and shall not be received by the owner, consignee, or other authorized person, it shall be lawful to hold the same by said carrier," etc., or the property may be stored with some responsible person, and be retained until the freight and all just charges be paid.

By reason of the negotiable character of the bill of lading, as well as by the practices and necessities of the commercial world, the assignees of same may oftentimes be said to have a better title, and stand in a better position as to the property named in the bill of lading, than the assignor himself had at the time of the transfer by indorsement. Since the assignor, as holder of the bill of lading, is entitled, on its face, to receive the property named therein on presentation of the bill of lading issued by the carrier, and known by the carrier to authorize the holder thereof by indorsement to receive, on presentation of same, the goods therein

named as owner, the assignee may be said to have rights superior and greater than the assignor of the bill. The assignor might, in fact (as defendant claimed the Courier Commission Company had no right to the property named in the bills of lading) have had no right to the property by reason of the property having been reshipped, and new bills of lading issued to it for the same, or on account of equities that might exist between the shipper and carriers to defeat the shipper's right to recover the property.

The Courier Commission Company was in the actual, authorized possession of those bills of lading issued by the defendant, which, in the growth and development of commerce and commercial credit, have come to represent the property itself, so that a transfer of the instrument operates to transfer the property. Being armed with these muniments of title and these symbols of property, which, by written indorsement, are negotiable, the holder of the bill is capable of diverting the property of the owner, and vesting it in the indorsee, although he had previously disposed of it to another, provided the indorsee was ignorant of the equities, in this possessing some of the attributes and qualities of a negotiable bill of exchange.

By these means the property was put under the power and control of the Courier Commission Company for disposition, without the actual delivery of the property itself to its assignee or vendee, and that, too, after an actual delivery might have been made to it or another, should the carrier deliver same to the purchaser without taking up the muniments of title outstanding in the hands of the shippers. If the defendant permitted the Courier Commission Company to remain in possession of these bills of lading after the grain had been reshipped by it for the Courier Commission Company, thereby holding it out to the world

as having the right to deal with the property, it will be estopped from denying that title and ownership of property in the hands of an innocent purchaser, pledgee, or mortgagee.

By delivering the grain to the Courier Commission Company, or by rebilling and reshipping it for the company, the defendant became liable to plaintiff, unless it can show some valid excuse. The record shows no laches—no act of omission or commission— of plaintiff which would authorize the misdelivery, or excuse the nondelivery, of it.

The case of *Barber v. Meyerstein*, L. R. 4 Eng. & Ir. App. *loc. cit.* 337, in commenting on the question of an indorser's laches, says: "This is quite immaterial when a man has got both the right of property and the right of possession, passing by a symbol, the bill of lading, which is at once both the symbol of the property and the evidence of the right of possession. When his title is thus complete, there is no obligation on him to give notice to anyone. There was, therefore, no laches on his part, nor was there any ground of complaint that he failed in ordinary prudence, or that he did not, in law and equity, complete his security."

Plaintiff had the right to rely upon the fact that, as it held the original shipper's bills of lading, and that, in the ordinary course of business, the grain could not be obtained except upon their production and surrender, it would be held for it. If the defendant saw fit to rebill and reship for the Courier Commission Company the grain called for in the bill of lading first issued by it, and sued on in this case, it must now suffer the consequences of its own carelessness.

The direction in the bill of lading to notify the Courier Commission Company at Kansas City in no way can be said to change, modify, or qualify the duty of the railroad company to deliver the grain to ship-

per's order. By the contract of affreightment, the duty of the railroad was threefold: *First*, to forward the grain; *second*, to notify the Courier Commission Company; in the *third* place, to deliver to shipper's order on arrival of the grain at its destination. If, after notifying the Courier Commission Company, it nor anyone came forward with the bills of lading duly indorsed, as provided by the terms thereof, it was the defendant's plain duty to put the grain in store, as provided by statute, as well as by the like emphatic dictates of necessity and business prudence. The duplicate bills of lading issued in this case, and marked as such, can not be treated as more than written memoranda, demanded by shipper and given by carrier for prudential purposes, in case of the loss of the original. In view of the present universal use and service of the bill of lading in the business and commercial world, great hardship and wrong would be perpetrated to hold otherwise.

For the reasons herein given, the judgment of the lower court is sustained. BRACE, C. J., and MACFARLANE, and BARCLAY, JJ., concur.