JOHN RATZER v. BURLINGTON, CEDAR RAPIDS & NORTHERN
RAILWAY COMPANY.[1]

April 24, 1896.

Nos. 9934—(253).

**Carrier—Pledge of Bill of Lading.**

The shipper of goods consigned them to himself, and received a bill of
lading from the railway company accordingly. The railway company de-
livered them, with a proper waybill, to the next connecting railway com-
pany, which, at the shipper's request, delivered the goods to him in transit
at an intermediate point, without the surrender or cancellation of the bill
of lading, which he thereafter, and before the goods would have arrived
at their original destination if the transit had continued, pledged, in the
usual course of business, to an innocent pledgee, for value. *Held*, the latter
railway company is liable to the pledgee for failure to deliver the goods at
the place of destination, and is estopped from showing such intermediate
delivery to the shipper.

Appeal by plaintiff from a judgment of the district court for
Hennepin county, in favor of defendant, entered in pursuance of
the findings and order of Russell, J. Reversed.

*J. F. McGee*, for appellant.

*Albert E. Clarke* and *Wilbur F. Booth*, for respondent.

CANTY, J. The Morrison Grain & Lumber Company shipped
three car loads of oats, two from Britt, and one from Forest City,
Iowa, to New York City. One of these cars was shipped on Jan-
uary 5, and the other two on January 7, 1895. A bill of lading
was issued for each car by the initial carrier. In each bill the
shipper is named as consignee, with the addition, "Notify John
Ratzer," and the destination named is New York City. The ini-
tial carrier transported the cars to Livermore, Iowa, and there de-
livered them (with proper waybills, showing New York to be the
destination) to the defendant, the next connecting carrier, with
which and a subsequent carrier it had through traffic arrange-
ments. The defendant carried the cars on its line towards their

[1] Reported in 66 N. W. 988.

destination until they reached Morrison, Iowa, on January 8 or 9, and there delivered all of the oats (of the value of $1,336) to the shipper, on its demand, without requiring a surrender or cancellation of the bills of lading. The shipper at this point converted the oats to its own use. Within a day or two after the oats were so delivered at Morrison, the shipper indorsed each of the bills of lading, "Deliver to the order of John Ratzer," and signed them. The shipper also drew drafts on said Ratzer, this plaintiff, in favor of the Bank of Reinbeck, for the amount of the purchase price of the oats, attached the drafts to the bills of lading, and delivered all of the same to the bank, which cashed the drafts in good faith, in the regular course of business, relying on the attached bills of lading. The bills of lading were, in the regular course of business, forwarded by the bank to New York, and presented to Ratzer, a commission merchant there, dealing in grain, who on January 14 and 16, 1895, in the regular course of business, paid the drafts in good faith, relying on the attached bills of lading, which he then and there received. If the three cars of oats had continued to New York, their destination, in the usual course of transportation, they would have arrived there between January 23 and 30. The shipper, the Morrison Company, is wholly insolvent.

Plaintiff brought this action to recover $804.94, the amount so advanced by him on the faith of the bills of lading. The case was tried by the court below, without a jury. The court found all of the foregoing facts, and thereon ordered judgment for defendant. From the judgment entered thereon plaintiff appeals, and urges, as a ground for reversal, that the judgment is not sustained by the findings of fact.

We are of the opinion that, on the facts found, the plaintiff is entitled to judgment. A vast portion of the produce of this country is moved from the agricultural districts to the commercial centers and the seaboards by the aid of advances made on the security of such bills of lading. A well-established custom has grown up in commercial circles by which such bills of lading are treated as the symbols of title to the property in transit, are taken as security for money advanced, and indorsed and delivered as a transfer of the property. This is well understood by the railroad com-

panies and every one else. To allow the railroad companies to ignore this custom would be to destroy the custom itself. This would cause great hardship, revolutionize business methods, and drive all buyers and shippers of small means out of the business, as they could no longer give ready and available security on commodities in transit, and thereby turn their limited capital sufficiently quickly and often to enable them to do much business. This, in turn, would destroy competition, and leave the business in the hands of a few concerns with unlimited capital. Neither have the railroad companies any right to ignore this custom. On the contrary, it must be held that these companies have been doing business with reference to this custom as much as the shippers themselves and the consignees, banks, commission merchants, and others who are continually advancing money on the faith of the security of these bills of lading. The effect of this custom, independent of G. S. 1894, § 7649, is to make bills of lading to some extent and for some purposes negotiable, and to give superior rights to innocent transferees for value in the usual course of business.

It is hardly necessary to cite authorities to the general proposition that, when a bill of lading is outstanding, the railway company delivers the goods at its peril, without a production of the bill of lading; and, if it so delivers them to some one other than the bona fide holder for value of the bill of lading, it is liable to him for conversion of the goods. What limitations or exceptions there may be to this rule we need not now consider. The following authorities show the universality of the rule as applied to transportation both on land and by water. See The Thames, 14 Wall. 98; North v. Merchants' Transp. Co., 146 Mass. 315, 15 N. E. 779; Forbes v. Boston & L. R. Co., 133 Mass. 154; Furman v. Union Pac. R. Co., 106 N. Y. 579, 13 N. E. 587; City Bank v. Rome, W. & O. R. Co., 44 N. Y. 136; Pennsylvania R. Co. v. Stern, 119 Pa. St. 24, 12 N. E. 756; Boatmen's Sav. Bank v. Western & A. R. Co., 81 Ga. 221, 7 S. E. 125; National Bank of Chester v. Atlanta & C. A. L. R. Co., 25 S. C. 216; Midland Nat. Bank v. Missouri Pac. R. Co., 132 Mo. 492, 33 S. W. 521; Armentrout v. St. Louis, K. C. & N. R. Co., 1 Mo. App. 158; Gates v. Chicago, B. & Q. R. Co., 42 Neb. 379, 60 N. W. 583; Garden Grove Bank v. Humeston

& S. R. Co., 67 Iowa, 526, 25 N. W. 761; Tindall v. Taylor, 4 El. & Bl. 219. See, also, as bearing on the question: Halsey v. Warden, 25 Kan. 128; Meyerstein v. Barber, L. R. 2 C. P. 38; Lee v. Bowen, 5 Biss. 154, Fed. Cas. No. 8,183; Hieskell v. Farmers' & M. Nat. Bank, 89 Pa. St. 155; Bass v. Glover, 63 Ga. 745; First Nat. Bank v. Dearborn, 115 Mass. 219; Dows v. National Ex. Bank, 91 U. S. 618; Conard v. Atlantic Ins. Co., 1 Pet. 386; Weyand v. Atchison, T. & S. F. R. Co., 75 Iowa, 573, 9 Am. St. Rep. 512, note, 39 N. W. 899. In the case of National Bank of Commerce v. Chicago, B. & N. R. Co., 44 Minn. 224, 46 N. W. 342, 560, it was held that the railroad company was not liable to the pledgee of the bill of lading. This was held solely on the ground that, as no grain was delivered to the agent of the railroad company when he delivered the bill of lading, he had no authority to issue it, and the company was not liable. That question is not involved in this case.

Respondent contends that the consignee is only obliged to produce the bill of lading, but not to surrender it when receiving the goods; and that as the Morrison Company held the bill of lading when the oats were delivered to it in transit, and it did not negotiate the bill of lading until afterwards, the defendant is not liable for so delivering the oats without requiring a surrender of the bill of lading. Whether or not the carrier can compel a surrender of the bill of lading when it delivers the goods it is not necessary here to decide. If the holder of the bill of lading insists on retaining it as a muniment of title, or for any other purpose, and has a legal right to do so, he can, at least, be required to produce it for cancellation, so that it will cease to be on its face a live bill of lading. And, in our opinion, it was the duty of the defendant at least to require this. It is immaterial that these bills of lading were negotiated to the bank and plaintiff after the oats were so delivered to the shipper. The bills were so negotiated before they had become stale, and even a considerable length of time before the oats would, in the ordinary course of transportation, have arrived at New York, their destination. The defendant permitted these bills to remain outstanding, with all the appearances of live, valid bills of lading. There was nothing to put any one dealing with the Morrison Company on his guard.

The facts in the case are quite similar to those in the case of Union Pac. R. Co. v. Johnson, 45 Neb. 57, 63 N. W. 144, where the defendant was held liable though the grain was delivered in transit at an intermediate point before the bills of lading were negotiated. In the case of Wells, Fargo & Co. v. Oregon R. & N. Co., 32 Fed. 51, the railway company was also held liable to the pledgee of the bill of lading for delivering the goods to the shipper in transit. In Armentrout v. St. Louis, K. C. & N. R. Co., supra, the railway company was held liable to the transferee of the bill of lading for delaying the transportation at the request of the shipper for a few days after it had issued the bill, thereby causing damage to the goods. In Tindall v. Taylor, supra, it was held that after the carrier had received the goods and issued a bill of lading for them to the shipper, and before the transit had commenced, it was not liable for refusing to redeliver the goods to him without a surrender of the bill. It was the duty of the defendant to see that the bills of lading were canceled when it redelivered the oats to the shipper, and its failure to perform that duty enabled the shipper to perpetrate a fraud on the bank and plaintiff. It is a case for the application of the doctrine of equitable estoppel, that, where one of two innocent persons must suffer by reason of the fraud of a third party, he by whose negligent act or omission such third party was enabled to commit the fraud ought to bear the loss. Under this rule, the defendant is estopped from showing that it delivered the goods to the shipper at the intermediate point, and is liable to plaintiff for failure to deliver them to him at the place of original destination. This disposes of the case.

The judgment is reversed, and judgment ordered for plaintiff, pursuant to this opinion.