IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

---

### NASHVILLE, DECEMBER TERM, 1913.

---

FOURTH NATIONAL BANK OF NASHVILLE *v.* NASHVILLE,
C. & ST. L. RY. CO.

*(Nashville.* December Term, 1913.)

1. **CARRIERS.** Freight. Delivery without bill of lading.
Though a railroad company wrongfully delivered grain without
the surrender of the bill of lading as required by it, the con-
signors had no right of action against it if they were not
injured because they had received payment for the grain.
(*Post, p.* 535.)
Case cited and approved: Witt & Watkins v. Railroad, 99 Tenn.,
442.

2. **CARRIERS.** Freight. "Bill of lading."
A "bill of lading" is not a negotiable instrument but is merely
a contract by a carrier to deliver the goods described at a
particular place according to the usual course of transportation.
(*Post, p.* 536.)

(530)                                          [128 Tenn.

Bank v. Railroad.

Cases cited and approved: Merchants', etc., Bank v. Railroad Co., 102 Md., 573; Midland National Bank v. Railroad Co., 132 Mo., 492; Ratzer v. Railway Co., 64 Minn., 245; Railway Co. v. Johnson, 45 Neb., 57.

3. CARRIERS. Bill of lading. Bona fide transferee.

Complainant bank first accepted a bill of lading, covering a shipment of grain, and an attached draft on February 10th, and that draft and three other drafts against the same bill of lading were subsequently dishonored and taken up by the maker, and when the fifth draft was deposited, which was likewise dishonored and was not taken up, the bill of lading had been issued for more than three months. The grain covered by it was a domestic shipment to an adjoining State. *Held*, in view of the staleness of the bill of lading, that the bank was not an innocent transferee of the bill of lading and was estopped from recovering from the railroad company for negligently delivering the grain without the surrender of the bill of lading. (*Post*, p. 538.)

4. ESTOPPEL. Equitable estoppel. Diligence.

One relying on an estoppel must have exercised such reasonable diligence as the circumstances require. (*Post*, p. 537.)

Cases cited and approved: Crabtree v. Bank, 108 Tenn., 483; Brant v. Va. Coal, etc., Co., 93 U. S., 326.

5. ESTOPPEL. Equitable estoppel. Knowledge of parties.

Where both parties have the same means of ascertaining the truth, no estoppel can exist. (*Post*, p. 537.)

6. ESTOPPEL. Equitable estoppel. Negligence.

One who conducts himself with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss cannot invoke the doctrine of estoppel. (*Post*, p. 538.)

7. ESTOPPEL. Good faith.

One claiming the benefit of an estoppel must have proceeded with the utmost good faith. (*Post*, p. 538.)

8. **ESTOPPEL.** Negligence.

If a ground of estoppel is based on negligence, the negligence must have been the proximate cause of the conduct of the complaining party. (*Post, p.* 539.)

9. **CARRIERS.** Delivery of goods. Bill of lading. Failure to require. Evidence.

In an action by the holder of a bill of lading for damages because defendant railroad company surrendered freight without presentation of the bill of lading, evidence *held* to show that such negligence by the railroad company was not the proximate cause of the bank's loss. (*Post, p.* 539.)

---

FROM DAVIDSON.

---

Appeal from Chancery Court, Davidson County.— JOHN ALLISON, Judge.

FRANK SLEMONS, SLOSS D. BAXTER, and CLAUDE WALLER, for appellant.

STONES & STOKES, for appellee.

MR. JUSTICE GREEN delivered the opinion of the Court.

This suit ways brought by the Fourth National Bank of Nashville against the railway company to recover from the latter the value of a shipment of grain made on an order notify bill of lading by Miller & Co., of Nashville, to the Santee Cypress Company, of Ferguson, S. C., which bill of lading was negotiated by the shipper at complainant bank. The shipment of grain

was released by the final carrier to the consignee without surrender of the bill of lading.

The suit was brought under the Carmack Amendment (chapter 3591, section 7, 34 Stat. at L., 584, 595 [U. S. Comp. St. Supp., 1911, p. 1307]) to the Hepburn Act to hold defendant railway company as the initial carrier liable for the default of the Atlantic Coast Line, which was the last carrier and the carrier handling the grain to the point of its destination.

The railway company answered and interposed several defenses. The chancellor rendered a decree in favor of complainant, and the railway company has appealed to this court.

Miller & Co. delivered to the railway company at Nashville some 400 bags of oats on February 10, 1910, to be shipped to the order of consignees at Ferguson, S. C., with directions to notify the Santee Cypress Company at the latter place. The railway company issued a through bill of lading in customary form containing, among other things, the following stipulation: "The surrender of this original order bill of lading properly indorsed shall be required before the delivery of the property."

On this same day Miller & Co. made a draft on the Santee Cypress Company for $1,041, to which draft was attached the bill of lading just referred to. The draft was deposited on account of Miller & Co. in complainant bank and cash credit was given to them for the amount thereof, less .025 per cent.

This draft was dishonored and returned. Miller & Co. paid to the bank the amount of the draft and on March 5, 1910, made another draft with this bill of lading attached on the Santee Cypress Company. The second draft was returned and taken up by Miller & Co., and on March 31, 1910, a third draft with the bill of lading attached was made on the above-mentioned consignee. The third draft was also dishonored, and on April 21, 1910, a fourth draft with the same bill of lading attached was made by Miller & Co. on the same parties, which draft was returned unpaid. On May 18, 1910, a fifth draft, to which was attached this same bill of lading, was made by Miller & Co. on the cypress company, and this draft was likewise dishonored.

Upon the return of the first four drafts, Miller & Co. made the amount of each good at the bank. They had received cash credit for all the drafts, less discount. By the time the fifth draft was returned, Mr. Miller, the head of this concern, had died, and his firm proved insolvent. Hence this suit by the bank against the railway company.

The grain in question was ordered from Miller & Co. by the Santee Cypress Company on open account, and no authority was given to Miller & Co. to draw on the consignee. When the shipment arrived at Ferguson, S. C., there appeared to be a shortage in it. On March 14th, however, a check was sent to Miller & Co. by the cypress company for the amount of the consignment, less the shortage, and the cypress company

having credit with the agent of the railroad company at Ferguson, S. C., the latter released the grain, on explanation that it had been paid for without the surrender of the bill of lading. The shortage in question was made good by Miller & Co., and on April 27th the cypress company sent a check for the balance of this order.

So that on May 19, 1910, when the draft with the bill of lading here sued on was last deposited in complainant bank, the grain represented by the bill of lading had been some time delivered to the consignee, and the shipper had been paid therefor.

At this time the consignors had no claim whatever against the railway company by reason of their possession of this bill of lading. Proper delivery had been made of the grain shipped, and the consignors had been paid for the same. While consignors held the bill of lading, its surrender to the railway company, so far as they were concerned, at this time would have been merely a matter of ceremony. This is pointed out in *Witt & Watkins* v. *Railroad,* 99 Tenn., 442, 41 S. W., 1064.

Although the railway company breached its duty in delivering this grain without the surrender of the bill of lading, no damages resulted to the consignors by reason of this breach, for they had received payment for their grain. The consignors had no right of action or just claim against the railway whatever.

There is some conflict of authority as to the rights of an innocent transferee of a bill of lading, fraudu-

lently negotiated, after there has been a delivery of the goods. It is not necessary to review these authorities here, owing to the peculiar circumstances of this case.

A bill of lading is not a negotiable instrument, but, if this one should be treated as such, there could be no recovery by the bank in this case. For if this bill of lading be considered as negotiable, it was "past due" at the time it was last transferred to the bank. A bill of lading is a contract or undertaking on the part of a carrier to deliver the goods therein described at a particular place, subject to the conditions therein contained, according to the usual course of transportation. This bill of lading was dated February 10, 1910. It covered a shipment from Nashville to a point in a neighboring State, and in ordinary course of carriage such shipment was due to be delivered long prior to May 19, 1910, the date upon which said bill of lading was last negotiated.

But, as said above, a bill of lading is not a negotiable instrument, and the rights of the parties are not to be determined by the application of rules controlling the transfer of commercial paper.

The cases which declare a carrier liable to the *bona fide* holder of a bill of lading fraudulently negotiated, after delivery of the consignment, proceed on the theory of estoppel. They rest on the principle that, where one of two innocent parties must suffer, he, by whose fault the loss was occasioned, must bear it. It is said that when a carrier issues a bill of lading, a

symbol of property, undertaking to deliver such property to the holder thereof, it is liable to one who acquires this bill of lading for value, if it has made delivery to another, even to the consignee, without the surrender of the bill of lading, but leaving some outstanding, and a loss is thereby occasioned to an innocent transferee. *Merchants,' etc., Bank* v. *Railroad Co.*, 102 Md., 573, 63 Altl., 108; *Midland National Bank* v. *Railway Co.*, 132 Mo., 492, 33 S. W., 521, 53 Am. St. Rep., 505; *Ratzer* v. *Railway Co.*, 64 Minn., 245, 66 N. W., 988, 58 Am. St. Rep., 530; *Railway Co.* v. *Johnson*, 45 Neb., 57, 63 N. W., 144, 50 Am. St. Rep., 540; Hutcheson on Carriers, vol. 1, sec. 182.

Is the complainant bank an innocent transferee, and is it entitled to recover in this case?

We think not. Applying familiar principles of the law of estoppel, the bank must be denied relief herein.

A party setting up an estoppel is bound to the exercise of reasonable diligence—such diligence as the circumstances of the case require. *Moore* v. *Bowman*, 47 N. H., 494. This rule is probably the foundation of the other rule that, where both parties have the same means of ascertaining the truth, there can be no estoppel. *Crabtree* v. *Bank*, 108 Tenn., 483, 67 S. W., 797, and *Brant* v. *Va. Coal, etc., Co.*, 93 U. S., 326, 23 L. Ed., 927.

That is to say, if a party decides upon a matter or determines his course with a careless indifference to means of information reasonably within his reach, or if he is heedless of circumstances highly suspicious

and sufficient to warn him, he will not be entitled to complain and invoke estoppel.

To hold that one, who shuts his eyes and disregards danger signals flaunted before his view, is an innocent party, entitled to invoke the doctrine of equitable estoppel, would be to encourage fraud. A person who so conducts himself scarcely acts in good faith, and it is well settled that a party must proceed in the utmost good faith to claim the benefit of an estoppel. 16 Cyc., 747, and cases there cited.

Referring again to the facts heretofore set out, complainant bank first took this bill of lading and a draft for the value of the grain February 10th. This draft was dishonored, and likewise three other drafts with the same bill of lading were dishonored before the final draft was negotiated. At the time the fifth draft was deposited, this bill of lading, covering a domestic shipment, was more than three months old. It was stale. It had previously passed through the bank's hands four times. The period during which this grain had been transported and delivered in ordinary course of business had long since expired. The bank should have known that something was wrong. It should have made some inquiry as to this collateral before taking it for the fifth time, if it expected to be protected as an innocent holder. The transaction of making five drafts on the same bill of lading was out of the ordinary and so unusual as to excite suspicion and to require investigation. The bank has been so negligent and remiss in this matter as to deprive it

of the status of an innocent transferee and to compel the court to rebuff the effort to obtain an equitable estoppel in its behalf.

Another principle is that, when an estoppel is sought to be based on negligence, such negligence must be the proximate cause of leading the complaining party into the mistake. 16 Cyc., 772, and cases cited.

While the carrier was of course negligent in delivering this grain without requiring the surrender of the bill of lading, we hardly think such negligence was the proximate cause of the bank's loss in this case. It is fairly inferable from this record that the bank received these drafts from the consignors and gave the latter cash credit therefor more by reason of the standing and supposed responsibility of the consignors than upon the faith of the bill of lading. The testimony of a bank official in this record shows that the account of Miller & Co. was very satisfactory, and that they enjoyed good credit at the bank. Every time one of these drafts was deposited by Miller & Co. and credited to their account, the bank made a profit of about $2.50.

Had this credit to Miller & Co. been extended solely or principally on the faith of the bill of lading, it is more than likely that the bank would have refused further credit thereon when the first or second draft was dishonored. It certainly would not have extended credit for the fifth time on collateral which had four times proven unavailable. The drafts were cashed, as we think, rather on the individual credit of Miller & Co. than on the faith of this bill of lading. Consequently

the bank's mistake as to the credit of Miller & Co. proximately occasioned its loss and not reliance upon the bill of lading.

Other interesting questions are presented in the case respecting the application of the Carmack amendment to these facts. We do not, however, find it necessary to consider them in this opinion, inasmuch as we must dismiss this bill for the reasons heretofore stated. The decree of the chancellor will be reversed.