LOWE *v.* EAST TENN., VA. & GA. RAILWAY CO.

Under the evidence the verdict was correct, the only testimony on
the subject of reasonable time being that the goods were carried
and reached their destination within the usual time occupied, ac-
cording to the usual course of business, in effectuating the trans-
portation between the point of shipment and the point of de-
livery, and there being no evidence of any special undertaking for
completing the transportation within a definite or fixed time.
There was no error in overruling the motion for a new trial.
August 1, 1892.                               *Judgment affirmed.*

Carriers. Negligence. Evidence. Before Judge
MILLER. Bibb superior court. November term, 1891.

Lowe sued the railroad company for damages, alleg-
ing that on the 10th of May, 1890, he loaded upon de-
fendant's car in Macon, by direction and consent of its
agents, a lot of peas which it agreed and undertook, at
a fixed rate of freight for the entire route, to transport
from Macon to New Orleans, and there deliver to Sey-
more & Company for plaintiff, said car-load of peas hav-
ing been by him consigned to Seymore & Company to
whom he had sold them at a certain price, to be deliv-
ered at the depot of the L. & N. Railroad Company in
New Orleans on the 15th or 16th of May; that on ac-
count of the unreasonable delay of the car in Macon
by the defendant, the peas did not reach New Orleans
until the 17th of May, whereas if the car had been for-
warded without unreasonable delay, and with due dili-
gence, it would have reached its destination on the 15th
of May, or sooner, five days being ample time within
which to effect the transportation; and that on account
of the failure of the peas to arrive by the 16th of May,
Seymore & Company refused to take them; and the pea
market having greatly declined and continuing to de-
cline, plaintiff was forced to dispose of the peas at a
price far less than what he was to receive from Seymore
& Co. In another count it is alleged that on the 9th of

May, the plaintiff contracted and agreed with the defendant to transport for him a car-load of peas from Macon to New Orleans for twenty-five cents per hundred pounds; that in pursuance of the contract the defendant placed a car on its side-track in Macon for the purpose of receiving the peas, and plaintiff placed them therein by eleven o'clock A. M. on the 10th of May, and they were immediately received by the defendant, who delivered to plaintiff a dray-receipt and bill of lading, the car then being ready for transportation ; but the defendant negligently and in violation of the contract allowed the car to remain in Macon until the night of the 12th of May, on account of which delay and failure to comply with the contract, the peas did not reach New Orleans until the 17th of May ; and that on account of their non-arrival by the 15th or 16th of May, Seymore & Company, to whom plaintiff had sold them to be delivered in the depot of the L. & N. Railroad Company at New Orleans by the 15th or 16th of May, refused to receive and pay for them; and the market having declined, plaintiff was forced to sell them at a loss as before stated.

At the trial Seymore, of the firm of Seymore & Company, testified :   Seymore & Company purchased a car-load of mixed peas of Lowe in May, 1890, to be delivered in railroad depot, New Orleans, between the 10th and 15th of May.   The price to be paid was $1.30 per bushel for mixed peas, and $1.50 for clay peas, as evidenced by original invoice attached to the interrogatories of the witness.   The car-load of peas was not delivered on the date contracted for ; the peas arrived in the L. & N. railroad depot May 19th. Seymore & Company declined to receive them on account of delay and non arrival at the time contracted for, and declared the trade off.   They would have taken the peas if they had arrived as late as the morning of May 16th.   They

had been sold to Boyle, a broker of New Orleans, who made demand for them on the 15th of May, but did not get them on account of delay and non-arrival. The contract with Lowe was made by letter. Witness knows when the peas arrived, by official notification from the L. & N. Railroad Company, received from the post-office on May 19th; does not know whether the peas arrived day or night.—The notification referred to appears to be dated May 17th, and states that certain peas consigned to Seymore & Company had arrived at the L. & N. railroad station in New Orleans, and were ready for delivery on payment of freight and charges. The invoice referred to in Seymore's testimony is dated at Macon, May 9th and 10th, 1890, and appears to be a memorandum of sale of a quantity of "M peas" at $1.30, "clay peas" at $1.50 and "unknown peas" at $1.50. Three letters from Seymore & Company to the plaintiff appeared in evidence. The first, dated April 30, 1890, directs the plaintiff to buy and ship two carloads of "clay peas" at $1.50 per bushel, and to draw at sight with bill of lading attached; and further says: "It is a risk on our part, as we may have to carry them a month, and by that time the demand will be about over. However, buy them and let us know promptly; also advise about the car of mixed and three cars whippoorwill. The unknown we call equal to clays, but dealers generally don't agree with us. Continue shipping until countermanded. The market is still weak and shows but little animation. There are so many plantations under water, there will not be the quantity of peas wanted that was anticipated. Dealers in consequence are loath in taking hold, fearing they may have to carry stock over another season." The second letter, dated May 5th, states: "We are just in receipt of your favor of second instant, and note what you say about shipping car of 400 or 500 bushels, strictly clay and un-

known peas by the 10th instant. You may also ship the car of mixed at your price of one and thirty hundredths (1.30) dollars per bushel, "F. O. B." Macon. It is too much, but we will risk one car anyhow. The peas to be fully up to sample, sound and in good sacks and well sewed. Whippoorwill peas are a drag on the market and we cannot increase our offer. Hurry your shipments along. Your sight-drafts, bills of lading attached, will be honored. We do not care to have any peas on hand after this month. The demand will be over, and it is dangerous property to carry over. The market is weak, nothing doing to-day. Receipts are liberal and increasing. Let us work promptly." The third letter, dated May 9th, is: "Owning receipt of your esteemed favor of the 6th instant, we beg to confirm our letter of 5th, a copy of which we herewith enclose, giving you full authority to ship. You may in addition to same ship one car of clean even running whippoorwill, at your price, $1.20 per bushel, "F. O. B." Macon. To be sound and in good sacks. Weight guaranteed. Let the car contain, if possible, at least 500 to 600 bushels. The market continues without any improvement, and very few peas moving. Hurry your shipments through by the Louisville and Nashville Railroad Company as speedily as possible. We will endeavor to handle all you can gather up, but must work promptly.

The plaintiff testified: I got these letters through the mail from Seymore & Company, in reference to this business. These of May, 1890, ordering a car-load of mixed and clay peas, refer to the lot involved in this suit. I telephoned to the defendant to know what its schedule to New Orleans was, and they told me it was about five days. I asked for Turner over the telephone, and to the best of my belief he answered. I asked for a car, which they said I could get, and they placed it as requested. I had it loaded with peas, and the drayman brought me

the ticket and bill about eleven o'clock on the 10th of May, 1890. (Identifies ticket and bill of lading, the ticket being signed "Halliburton for agent," and the bill of lading signed "J. H. Turner, agent (H)." Each is dated May 10, 1890, and acknowledges receipt from the plaintiff of the peas, consigned to "order, notify D. C. Seymore & Company, New Orleans, La." The bill of lading as introduced in evidence was indorsed by the plaintiff.) Continuing, the plaintiff testified: I first learned that Seymore & Company refused to take the peas about the 20th or 21st of May, by the draft being returned through the bank, and by a letter and telegram therefor. This is the draft I attached to the bill of lading and sent with the peas. (The draft is dated at Macon, Georgia, May 10, 1890. It is drawn by the plaintiff in favor of L. P. Hillyer, cashier, on D. C. Seymore & Company, New Orleans, La. It is indorsed with pencil memorandum, "Left notice May 12, 1890"; also with the following, stamped and erased: "Pay Whitney National Bank or order for collection for account of Merchants National Bank, Macon, Ga."; also the same entry again made.) This draft represents the amount for which I had sold the peas. Seymore & Company were to pay the freight from Macon to New Orleans. The letters "F. O. B." mean free on board of cars. I first telegraphed on the 12th. I commenced telegraphing as soon as the draft came back. I had the bank to telegraph on the 12th to know if Seymore had paid the draft. I indorsed the bill of lading when I put it in the bank, so they could turn it over to the party who would pay the draft. I indorsed it for the purpose of collection and to be delivered to Seymore when he paid the draft. The words "order, notify" on the bill of lading mean he must pay for the peas before the peas will be delivered to him; and he has got to have the bill of lading to get them. I am positive I had

the bill of lading and put it in bank by eleven o'clock.
I saw it again about the 15th of May, in the Merchants
National Bank.

I. L. Smith testified: I finished loading the peas for
Lowe on the car of the defendant at ten o'clock or a
quarter to ten, or it might have been a little later. The
railroad gave me the bill of lading and dray-ticket in
the morning about ten o'clock. I saw the car on Mon-
day after it was loaded, about half-past ten o'clock,
right where I had loaded it. I went to Mr. Halliburton
and asked him what was the reason it had not been
sent, and he went to the billing clerk. Halliburton is
the one who gives the bill of lading and collects freights
for the defendant. He told me it had been overlooked
and he did not pull it out; said he supposed Wood
had failed to bill it. I did not know the freight sched-
ules. I know the trains left in the early part of the
night. Turner was agent of the defendant. Halliburton
told me switch-engine would take the car right then to
the cotton yard to make up the train. This was about
half-past eleven o'clock Monday morning. He had also
told me the same thing on Saturday before. I am posi-
tive it was not later than eleven o'clock when I got the
bill of lading; might have stated on the former trial
I got it between eleven and twelve o'clock. It is not
possible that I got it as late as between one and two
o'clock. I got it and the dray-ticket at the same time.

From the testimony of Blackman, a broker in New
Orleans, it appears that the plaintiff placed the peas in
his hands for sale on or about the first of June. Part
of them were sold on June 25th at 60 cents per bushel,
and the balance June 30th at 45 cents per bushel. He
did not sell them as soon as they were placed in his
hands, on account of there being no demand for that
class of peas at that time; the market was stagnant.
He endeavored daily to sell them and spared no effort

to effect a sale. The price obtained was fair. The market continued to decline from the time he first offered them until they were sold. They were sound and good. He did not remember whether there was any marked decline in price between the 15th and 17th of May, nor the exact quotations from the 10th to the 17th of May; the market was nominal and hard to quote; it continued to decline almost daily. He did not sell any peas on May 15th, 16th or 17th.

Turner testified: Was local agent of the defendant. I think we had a schedule of freight-trains going out in the afternoon of each day; sometimes we did not have cars enough, and in such cases the schedule was annulled. If the train which was to leave here that day, leaving on Saturday, could get out of Georgia before Sunday, it would not have to stop; if it was possible for it to get out of the State it would have gone straight to New Orleans, if it made connection at Calera, Ala. We run the train to Atlanta, the next section to Rome, and thence to Calera. There was a joint agency at Calera with the L. & N.; that is, the agent acted for both companies. I do not recollect Lowe telephoning me about this car. I never made any contract with him. We do not make any contract for special delivery. Seven or eight days is not an unreasonable time for a shipment of peas from Macon to New Orleans. Our sugar shipments run as perishable; we make in four or five days, and that is considered very fast time. This car was treated just as any other non-perishable shipment would have been treated. If a car is loaded to-day, in order to be forwarded this afternoon it must be ready and the billing clerk notified before eleven o'clock, as it is customary with most of the trains to require the switch-engine to leave between one and two o'clock; if the car is not ready by 10.30 it is left there until that night, when the switch-engine comes over be-

tween ten and four o'clock in the morning for the local cars. If a car is to be ready to go, it must not be later than 10.30 in the morning; it takes some time to switch them out. If you miss one connection and Sunday intervenes, the car would have to wait until Sunday night between ten and four o'clock. If it had been on Friday it would have gone Saturday morning between ten and four o'clock, and would have gone away on the first through freight-train that left Saturday morning. If it missed eleven o'clock Saturday morning, Sunday intervening, it would not go out until Monday, unless some special arrangements to have it delivered at the cotton yard. If our attention had been called to it and special arrangements made, we might have had the engine come over and carry it to the cotton yard, and then possibly the car might have got as far as Atlanta or Rome before Sunday. We permitted Halliburton to sign bills of lading. If a car was loaded too late on Saturday to be taken out on the Saturday evening train, it would go out some time Sunday night and go away Monday morning. If that car had left here at twelve o'clock Sunday night, possibly it would have reached Rome in sixteen to twenty hours. If the car had been taken out of the river yard at ten o'clock, no doubt it would have gone out that afternoon, if the regular schedule had not been annulled. When special arrangements are made, the switch-engine will take cars out after twelve o'clock. A car taken out of the river-yard in the afternoon would not go on the train which left between four and six o'clock. I think the schedule time was 4.30. All shipments generally receive the same treatment. The causes of delay in shipments from here to New Orleans are various; sometimes trains might be late, the north bound would be side-tracked, they might not make connection at Rome or Calera, and the Alabama division train might have left. It is

between six and seven hundred miles to New Orleans over the railroads of the defendant and the L. & N. company. A train might go through to New Orleans without any trouble.

Halliburton testified: Lowe did not make any contract about the time of shipment with me. I had no communication with him by telephone or otherwise. The bill of lading was delivered in the afternoon between two and three o'clock. I do not recollect making any statement to I. L. Smith about the car on Monday.

The jury found for the defendant. The plaintiff moved for a new trial on the general grounds, and the following special grounds:

Errors in charging: "In this case the peas under the bill of lading could only be delivered to the order of the shipper. If the jury believe from the evidence that the bill of lading had been sent back from New Orleans and was not in that city on the 15th and 14th of May, and the bill of lading could not have been presented and the goods received thereon, the jury is authorized to consider this fact in reaching a conclusion as to whether or not the alleged delay in defendant was the cause of Seymore & Company's refusal to take the goods. In order to entitle the shipper to recover, he must show himself able to comply with his contract at the time the alleged delay is claimed to have injured him." These instructions were assigned as error, because they rendered recovery for delayed shipment impossible; because no act of the plaintiff could defeat a recovery, unless it inured to or caused the delay; and because the facts did not authorize such instructions.

The court erred in refusing to allow the plaintiff to prove by I. L. Smith what Halliburton said on Saturday, the day the peas were loaded, to wit: "What did he tell you on Saturday before? He told me that the car would go at half past eleven or twelve and go off in the

train. That was the reason why I went to him on Monday."

The court erred in ruling out the following testimony of D. C. Seymore: " D. C. Seymore & Company purchased a car-load of mixed peas of Lowe during the month of May, 1890, to be delivered in railroad depot in New Orleans between the 10th and 15th of May. The price to be paid was $1.30 per bushel for mixed peas, and $1.50 per bushel for clay peas, as evidenced per original invoice herewith attached, marked exhibit A & B."

The plaintiff further assigns as error that the court refused to allow him, on the hearing of the motion for a new trial, to attach as an exhibit thereto, and use as evidence thereon, an affidavit by two of the jurors, stating that the jury had no doubt under the facts that the defendant was negligent in shipping the car, but that the verdict was controlled by the charge of the court, that unless the bill of lading was in New Orleans on the 14th and 15th of May, the plaintiff could not recover, and that it was upon that part of the charge that the jury returned the verdict for the defendant.

It is further complained that the court refused to allow the plaintiff to incorporate in the brief of evidence the substance of a letter from Seymore & Company to the plaintiff, which was not in fact read to the jury, but which the plaintiff alleges was with his other documentary evidence on the trial and was lost before it was read to the jury, the reading of documentary evidence having been waived by the defendant, and the plaintiff claiming to have first discovered the loss of said letter during the argument. The plaintiff alleges that the substance of this letter was: " You must ship so as to reach New Orleans by 10th or 15th, not later than 15th of May, 1890." The plaintiff's counsel claims that he called the court's attention to the fact that the letter

was lost, as soon as discovered, which was during his closing argument, when the court replied, "I have not got it; go on"; but the counsel made no motion to continue, nor any request to have the case suspended until he could find the letter.

L. D. MOORE, by brief, for plaintiff.

HILL, HARRIS & BIRCH, for defendant.