BURNS, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Respondent.

*November 8 — November 24, 1899.*

*Railroads: Delays in transporting horses: Negligence: Failure to feed and water: Interstate commerce: Contributory negligence: Delay in unloading.*

1. Where the route over which horses are shipped is not a continuous line, but a combination of various lines, not traversed by any train for the whole distance continuously, the shipper is charged with notice of delays at junctions, indicated upon the scheduled time-tables, and such delays can form no ground for a charge of negligence against the carrier.

2. Where in such a case the carrier agreed to place the cars at the end of a private spur track which the shipper had a right to use by agreement with the owner, delay in transit occasioned by an agreement between such owner and the carrier that the spur should be used for switching in the afternoon only does not constitute negligence on the part of the carrier.

3. A provision in a special contract for the transportation of horses that the owner shall "bear the expense" of feeding and watering during transportation does not relieve the carrier from the obligation to furnish upon request the requisite opportunities for unloading the stock for that purpose, even though an employee of the shipper receives free transportation in order that he may care for them.

4. The fact that about 2:30 o'clock p. m., after the horses had been in the cars more than thirty-three hours, the owner told the carrier's agent at the station where the cars were then standing that the horses ought to be fed and watered, and that unless they reached their destination on the spur track before dark they could not be

Burns vs. Chicago, Milwaukee & St. Paul R. Co.

unloaded that night, is *held* equivalent to a request that the cars be placed at some point where feeding and watering could be done.

5. The carrier's agent in such a case is chargeable with notice of the length of time the horses had been in the cars.

6. Secs. 4386, 4387, R. S. of U. S. (providing that no railroad company carrying stock from one state to another shall confine the same in cars for a longer period than twenty-eight hours without unloading for rest, etc., for five consecutive hours, and that if the owner fails to feed and water the stock when unloaded the company shall do so at the owner's expense), imposes a duty upon the company for the benefit of the owners of stock transported, and failure to perform that duty constitutes actionable negligence at the suit of an owner who is injured thereby. The fact that a penalty is imposed for a breach of such duty does not prevent a civil action based on such negligence, the penalty not being given to the injured party in satisfaction for the injury.

7. It was not negligence for persons in charge of the horses, after their arrival in the morning at the station nearest the spur track upon which the cars were to be placed for unloading, to rely on promises by the carrier's servants and agents that the horses would be forwarded presently, nor to omit an attempt to unload and feed them at 2:30 p. m., when only two hours remained in which to do it.

8. Failure to unload the horses upon their arrival at the spur track after dark is *held* not to constitute negligence as matter of law, where the evidence showed that the night was dark and snowy; that the cars were in the woods, half a mile from the place to which the horses were being taken; that there were no conveniences for unloading, but temporary platforms would have to be erected; and that unloading them upon such platforms in the dark was a hazardous undertaking.

APPEAL from a judgment of the circuit court for Oconto county: S. D. HASTINGS, JR., Circuit Judge. *Reversed.*

This is an action for damages caused by alleged negligent delays in the carriage of two carloads of horses over the defendant's road, and by neglect to feed and water said horses while in transit. The facts were not greatly in dispute. It appears that on the 7th of January, 1896, the plaintiff shipped sixteen horses in two freight cars on the defendant's road at Oconto to Boyd's log track, in the state of

Michigan, a distance of about 130 miles. This log track is a
spur about three miles in length, owned by the Bergland
Lumber Company, and used by that company and other lum-
bering concerns by their permission for getting logs out of
the woods. It extends from the Channing branch of the
defendant's road in northern Michigan, and branches off
from the defendant's track at a point in the woods about
seven miles north of a station called Sidnaw. The under-
standing at the time of the shipment was that the cars were
to be placed at a point near the end of this private track.
The horses were fed and watered at about 1 o'clock in the
morning of January 7th, were then loaded upon the cars,
and left Oconto at 5 o'clock a. m.; the horses in each car
being in charge of an employee of the plaintiff. They were
shipped under a written contract, which provided that there
should be no liability for delay unless caused by gross neg-
ligence, and also that the owner or party in charge should
bear the expense of feeding and watering the same during
transportation. The contract also provided that the plaint-
iff's employees in charge of the stock should be transported
without charge on the same train. There was a logging
outfit, besides a considerable amount of hay and other feed,
shipped in the cars with the horses.

At 5:30 o'clock a. m. the cars reached Oconto Junction,
where they remained until 8 o'clock, waiting for the regular
train going north on the main line. This train took them
to Iron Mountain, Michigan, where they were cut out and
left, because that train went through on the main line to
Champion, and made no connection with the train on the
Ontonagon branch, where these cars were going. They re-
mained at Iron Mountain from about 1 o'clock p. m. until
about 8 o'clock p. m., when they were put into a train and
taken to Channing, which point was reached about 11 o'clock
p. m. of the same day. They remained at Channing until
3 o'clock on the morning of the 8th, and were then taken

upon the first train upon the Ontonagon branch, and left
at Sidnaw at about 7 o'clock a. m.   Here they were cut out
of the train, and remained upon the side track until about
4:30 o'clock p. m., when a switch engine stationed at Sid-
naw took them to Boyd's log track, and, after taking out
the loaded cars from the track, placed the cars in question
near the end of the track at about 7 o'clock in the even-
ing.

The horses had no food or water during the entire trip.
There were appliances for this purpose at Iron Mountain,
but the plaintiff's employees in charge of the stock testify
that they did not need food or water while there.   There
was also a movable chute for the unloading of horses at Sid-
naw, and water could be easily obtained there, but the plaint-
iff's employees say that they did not see any platform or
chute there, and it appears that the cars were not placed
where the horses could be taken out.   They did not ask that
the cars be placed at any chute or platform, or that they
should be fed or watered; and give as a reason for this that
the agent at Sidnaw told them on their arrival that the cars
would be taken to the logging track at 8 or 9 o'clock a. m.,
and that, not being taken at that time, they went to the agent
again at about 11 o'clock, and he told them they would be
taken right after dinner, and that between 2 and 3 o'clock
p. m. the agent finally told them they would not be taken
until after the passenger train went south.   The plaintiff
himself arrived at Sidnaw by passenger train at 11 o'clock
a. m. of the 8th, while the horses were still there, but he
made no effort to feed or water the horses, nor did he di
rectly demand of any of the defendant's employees that the
horses be placed at a chute at Sidnaw, but he testifies that
he told the agent at about 2:30 o'clock p. m. that the horses
ought to go somewhere where they could be fed and watered,
and that, if they did not get to their destination before dark,
they could not be unloaded that night.   The plaintiff gives as

the reason for not saying anything to the station agent before 2:30 o'clock p. m. that he thought the cars would be taken to their destination at any time, and that he was so informed by the men in charge of the horses. At about 2:30 o'clock p. m. he was told by the agent that the cars would not be taken to their destination till after the passenger train went south, which was about 4:30 o'clock p. m.

The reason given by the defendant for leaving the cars at Sidnaw was that Boyd's log track is a private logging road, owned by the Bergland Lumber Company, and that the agreement between the said company and the defendant was that no switching was to be done upon said private track in the morning, because cars were then being loaded at various places along the track, and switching would greatly hinder the loading of cars. It appears that the Sidnaw switch engine went upon the track after dinner, and took out as many loads as possible before the main line had to be cleared for the passage of the regular passenger train at 4:30 p. m. Immediately after the passage of that train, the balance of the loaded cars were taken out, and the cars in question were set in upon the track. After the cars were placed at their destination in the woods, it was dark and snowy and somewhat stormy, and there were no facilities for unloading the horses at that point, so the plaintiff left the horses until the morning of the 9th, when temporary platforms were constructed, and the horses taken out and fed and watered. The horses were seriously injured in health, and rendered unfit for work for a time.

Upon these facts the court directed a verdict for the defendant, and the plaintiff appeals.

For the appellant there was a brief by *W. H. Webster*, and oral argument by *D. G. Classon*.

For the respondent there was a brief by *Greene, Vroman, Fairchild, North & Parker*, and oral argument by *C. E. Vroman*.

WINSLOW, J.  The evidence clearly shows that the transportation of the horses from Oconto to Sidnaw proceeded according to the ordinary and regular course of train.  The route from Oconto to Sidnaw was not a continuous line, but a combination of various lines connecting at junctions, but not traversed by any train for the whole distance continuously. At these junctions there were delays of hours at a time, which were indicated upon the scheduled time-tables of the defendant company, and of which shippers must take notice, and which, consequently, can form no ground for a charge of negligence.  *Lowe v. E. T., V. & G. R. Co.* 90 Ga. 85; *Schwab v. Union Line,* 18 Mo. App. 159.

The delay at Sidnaw was under somewhat different circumstances.  The cars could have been taken along by the train which left them at Sidnaw to the lead of Boyd's log track, and placed upon that lead just off the main track; but this was not the place where it was understood they were to be placed.  The understanding was by all parties that they were to be placed at the further end of the log track, nearly three miles distant.  This is the only reasonable construction of the contract of shipment in the light of the surrounding circumstances, and this could not be done by the heavy freight engine drawing the train, because the log track was full of steep grades and curves and was not fitted for the passage of such an engine.  Nor was there any request by those in charge of the horses that the cars be left on the lead.  Hence the cars were left at Sidnaw, to be taken to the place of destination by the light switch engine which was there stationed.  The evidence is conclusive that this log track was a private track, owned by the Bergland Lumber Company, which concern had, by contract, given the Holt Lumber Company the right to use it for logging operations at the time in question.  The plaintiff was about to do logging for the Holt Lumber Company, and on that account only had the right to have his cars placed upon the log

track.. The agreement between the Bergland Company and the defendant as to the switching upon this track was that such switching was only to be done in the. afternoon, because switching in the morning would seriously interfere with the loading of cars, which was proceeding at various places along the track. It was by reason of this agreement that the plaintiff's cars were not taken up to the place of destination at the end of the log track until late in the afternoon, and thus it appears that they reached the desired point in due and regular course of train. The Bergland Company, being the owners of the track, certainly had the right to stipulate as to the manner of its use. So we conclude that there was no negligence shown on the part of the defendant in the various delays in transit.

But it is claimed that the defendant should have fed and watered the horses, and was negligent in failing so to do. The evidence shows that the horses did not need to be fed or watered when they stopped at Ironwood, and the only place where it can be reasonably claimed that they should have been fed and watered is at Sidnaw, where they remained from 7 o'clock a. m. until nearly 5 o'clock p. m. The evidence is undisputed that the horses were loaded so closely head and tail that it was impossible to feed or water them on the cars, and that it would have been necessary to unload them from the cars for that purpose. The rule of common law is that, in the absence of special contract, the carrier is bound to feed and water live stock transported by it at proper intervals. 4 Elliott, R. R. § 1553. Special contracts are frequently made by which the owner assumes the duty to feed and water, and such contracts are valid and will be enforced; the duty of the carrier in such case being discharged when it furnishes the owner or person in charge reasonable opportunities for feeding and watering in transit. *Abrams v. M., L. S. & W. R. Co.* 87 Wis. 485. In the present case the special contract under which the horses were

shipped provides that the owner shall " bear the expense " of feeding or watering the stock during transportation. This provision varies the common-law duty of the railway company to the extent of its terms reasonably construed, but no more. The extent of that variation in terms is simply that the owner shall bear the expense of feeding and watering. Certainly there is no reasonable construction of those words, considered alone, which would relieve the railway company from the duty of placing the cars where the horses could be unloaded by the person in charge in a case like the present, where the evidence shows that the horses could not be fed or watered while on the cars. It is argued, however, that because the plaintiff had a man in charge of the horses, who received free transportation in order that he might look after them, the entire contract should be construed as meaning that the man in charge, or owner, assumed the duty of unloading to feed and water the stock, if unloading be necessary for that purpose. Conceding that such should be the proper construction of the contract, the company would still be obliged to furnish upon request the requisite opportunities for unloading the stock preparatory to feeding and watering. *Abrams v. M., L. S. & W. R. Co., supra.* The owner testifies positively (and his evidence seems to be undisputed on this point) that he told the agent at Sidnaw at 2:30 o'clock p. m. that the horses ought to go somewhere to be fed and watered, and that, if they did not get to their destination before dark, they could not be unloaded that night. The agent was charged with knowledge that the horses had then been on the cars more than thirty-three hours, and it seems to us that this statement, though somewhat indefinite, was equivalent to a request that the cars be placed at some point where such feeding and watering could be done.

Another consideration arises here, however, which does not seem to have been called to the attention of the trial

court. This was an interstate contract of carriage. Sec. 4386 of the Revised Statutes of the United States provides, in substance, that no railroad company carrying cattle, sheep, swine, or other animals from one state to another shall confine the same in cars for a longer period than twenty-eight consecutive hours without unloading the same for rest, water, and feeding for a period of five consecutive hours, unless prevented from so doing by storm or other accidental cause. Sec. 4387 provides that the owner or person in charge of the stock shall feed and water the same when so unloaded, and, if he fails so to do, the railroad company shall feed and water them at the expense of the owner or person in charge, and have a lien on the animals therefor. Subsequent sections provide for the recovery of a penalty by action in the name of the United States for failure to comply with any of the provisions of the two sections. There can be no doubt of the application of these sections to the present case. Under them it became the duty of the railroad company in this case to unload the horses for a rest of five hours at 9 o'clock a. m. on the morning of the 8th, while they were waiting at Sidnaw, and this duty depended on no demand or request by the owner. The law was doubtless passed for humanitarian reasons largely, but also evidently for the protection of owners of stock transported. It imposes a duty on the railroad company for the benefit of such owners, and, under familiar principles, failure to perform such duty constitutes actionable negligence at the suit of an owner who is injured thereby. Nor does the fact that a penalty is imposed for breach of such duty take the place of a civil action based on the negligence, unless such penalty be given to the injured party in satisfaction for the injury. *Smith v. Milwaukee B. & T. Exch.* 91 Wis. 360; *Klatt v. N. C. Foster L. Co.* 97 Wis. 641. Actions for negligence, based upon the nonperformance of this statutory duty, have been sustained by the courts of last resort in Massachusetts and Virginia

upon very satisfactory reasoning. *Brockway v. Am. Exp. Co.* 168 Mass. 257; *Chesapeake & O. R. Co. v. Am. Exch. Bank*, 92 Va. 495. In the first of these cases it is said: "Under the statute above referred to it was the duty of the railroad company to unload and feed and water them [the stock] without a request from their custodian if he failed to do it." And it was further held in that case that a failure to perform such duty might become gross negligence. It is evident, therefore, that there was sufficient proof in the present case to take the case to the jury upon the question of negligence on the part of the railroad company.

But it is strenuously claimed that the evidence shows contributory negligence on the part of the plaintiff, both in failing to attempt to unload and care for the horses at Sidnaw and in failing to unload them at night after they reached their destination. We are unable to say that contributory negligence appears, as a matter of law, at either place. At Sidnaw the evidence of the plaintiff shows that up to 2:30 o'clock p. m. the persons in charge of the horses were put off with promises that the cars would be presently forwarded; and it seems unreasonable to say that it was necessarily negligence for the plaintiff to rely on such promises, or to omit an attempt to unload and care for the horses when only two hours remained in which to do it. As to the failure to unload the horses after they reached their destination, the evidence shows that it was dark and snowy; that the stopping place was in the woods, nearly or quite half a mile from the logging camp, where there were no conveniences for unloading, but where temporary platforms for that purpose would have to be erected. There was also evidence tending to show that to attempt to unload them after dark upon a temporary platform was a hazardous undertaking, in the course of which the horses would be liable to break their legs or otherwise injure themselves. Upon the whole evidence we think it was a proper question for the jury

whether the plaintiff, in waiting until daylight before unloading the horses, was guilty of contributory negligence.

No other questions are necessary to be considered.

*By the Court.*— Judgment reversed, and action remanded for a new trial.