## NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY v. SPARKMAN, PETTY & JAMESON.

Middle Section.    October 13, 1928.

No petition for Certiorari was filed.

684

Hughes & Hughes, of Columbia, for plaintiff in error, Railway.

Hopkins & Sewell, of Columbia, for defendants in error, Sparkman, et al.

CROWNOVER, J. These two actions were instituted to recover damages for the death in transit of sheep owned by the defendants in error, and although separate actions, they were by agreement tried together on the same testimony in the court below. Both actions were originally brought before a Justice of the Peace and were appealed to the circuit court, where they were tried by a judge and a jury and resulted in verdicts for the plaintiffs below in the sums of $90 and $10; but the verdicts were set aside and new trials granted. On the second trial the jury returned a verdict for $100 damages for the plaintiffs below.

At the conclusion of all the evidence the defendant moved for peremptory instructions but the motion was overruled and the jury returned a verdict for $100. The defendant's motion for a new trial was overruled and it has appealed in error to this court and has assigned two errors which go to the same proposition, that is, that the court erred in refusing to direct a verdict as there was no evidence to support the verdict of the jury.

The facts necessary to be stated are that the damages for which these actions were brought grew out of the shipment of two carloads of sheep, one from Burns, Tennessee to Carters Creek, Tennessee in April, 1922, and when this car reached its destination nine of the sheep were dead; and the other carload was shipped from

Dickson, Tennessee to Carters Creek, Tennessee in May, 1922 and when that car reached its destination there were two dead lambs, one dead ewe and another ewe bruised up so that she died within a few days. Both shipments originated on the line of the defendant, the Nashville, Chattanooga & St. Louis Railway and were transported by said carrier over its line to Nashville and there delivered to the Louisville & Nashville Railroad Company, which latter carrier transported them to destination.

Said shipments were made on bills of lading known as the Uniform Livestock Contract, adopted by carriers in the Southern and Western classification territories on March 15, 1922, as prescribed by the Interstate Commerce Commission, but both shipments were intrastate. Each one of the contracts contained the following provision:

> "Now, therefore, this agreement witnesseth, that the carrier has received from the shipper, subject to the classifications and tariffs in effect on the date of issue of this agreement, the livestock described below, in apparent good order, except as noted, consigned and destined as indicated below, which the carrier agrees to carry to its usual place of delivery at said destination, if on its road or on its own water lines, otherwise to deliver to another carrier on the route to said destination."

The proof shows that the car shipped from Burns to Carters Creek in which nine dead sheep were found at destination, was loaded about 2:30 p. m. and transported to Nashville the same day and was delivered at the Kayne Avenue Yards at 7:15 p. m., which was a reasonable and usual period of time for the movement of such freight, where it was delivered to the Louisville & Nashville Railroad Company to be transported over its line to destination. Said car was transported by the Nashville Terminals from Kayne Avenue Yards out to the Radnor Yards of the Louisville & Nashville Railroad Company at about nine p. m., where it remained until seven a. m. the next day, when it was transported, and arrived at destination about 12:30 p. m. the same day.

The facts with reference to the car shipped from Dickson to Carters Creek were practically the same, with respect to the time of shipment and the handling of the car.

The defendant's conductors on the respective freight trains testified that they examined the respective cars at stations before they reached Nashville and that they saw no dead sheep, and that the cars were promptly handled, and that there were no unusual jolts or jars in transit, but neither of the conductors testified as to the condition of the sheep when they arrived in Nashville. The foreman of the switching crew which handled the cars at the Nashville

Terminals for the Louisville & Nashville Railroad Company made no notation of any dead sheep in the car; but the Louisville & Nashville Railway conductor said that there were a lot of dead sheep in the car shipped from Burns, Tennessee, when he took charge of the car at the Radnor Yards at seven a. m. the next day, and one of the section crew who helped to unload and bury the dead sheep stated that "they were bruised and stunk, and that they were all piled up on each other in the north end of the car, dead."

It is not known whether the sheep were killed while in possession of the Nashville, Chattanooga & St. Louis Railroad, or while in the possession of the Louisville & Nashville Railroad Company, but there was enough proof that the sheep were bruised up so as to carry to the jury the question whether the sheep were killed by the defendant or by the Louisville & Nashville Railroad Company.

It will be observed that the initial carrier is sued but the terminal carrier was not sued. These being intrastate shipments, the initial carrier was not bound to transport the shipment beyond its own line and was not liable for loss or injury accruing on the line of a succeeding carrier, in the absence of a special contract. In the absence of any agreement, express or implied for transportation beyond its own line, the common-law duty of an independent carrier is performed by safely transporting the goods over its own line without unreasonable delay, and delivering them to the consignee or connecting carrier. See 4 Elliott on Railroads (3 Ed.), sec. 2160; 4 R. C. L., 876, sec. 329; Post v. Southern Railway, 103 Tenn., 184, 206, 52 S. W., 301.

In Tennessee we follow the English rule, which is supposed to have its origin in the case of Muschamp v. Lancaster & P. J. R. Co., 8 Mees & W., 421, and hold that in the absence of an express stipulation to the contrary, an undertaking to carry the shipment to its ultimate destination is implied from the mere act of acceptance, and the carrier is responsible for loss or injury occurring on the line of any succeeding carrier to which the shipment is entrusted to continue or complete the transportation. Transportation Co. v. Bloch Brothers, 86 Tenn., 393, 6 S. W., 881; 4 Elliott on Railroads (3 Ed.), sec. 2164.

The other view, known as the so called "American rule," followed by the Federal courts and the courts of many other states, is that the duty of a railroad receiving a shipment marked for a destination beyond its own line is discharged, in the absence of a special agreement or course of business to the contrary, by safely carrying the goods over its own line and delivering them in good order to the next succeeding carrier to continue or complete the transportation.

"All authorities are now agreed we believe, in holding that the first of a number of successive companies rendering service in the carriage of freight between distant points, may so bind itself to deliver goods beyond the terminus of its own line as to become responsible for their safe carriage through the entire journey; but with respect to what is necessary to constitute such a contract the English and American authorities are quite inharmonious. The English rule is that the receipt of goods marked for a given point, without a positive limitation of responsibility, affords prima facie evidence of an undertaking on the part of the carrier to safely transport them to their destination, whether within or beyond the limits of its own line; while in America most of the courts regard each company as liable in the common carrier capacity only for the extent of its own line, unless there be a special contract to the contrary. The latter may be stated to be the American rule; though some of the States, Tennessee among the number, have adopted the English rule as more consonant with sound reason and public policy." See Transportation Co. v. Bloch Brothers, supra.

There is an able discussion of the two doctrines in the notes to 31 L. R. A. (N. S.), 1 to 112, and a great many cases on the liability of the carrier for loss beyond its own line are reviewed, in which it is stated that these two doctrines differ solely in the weight which they attach to the mere acceptance of the goods. Under the English rule, in the absence of a special contract, the first carrier is only bound to deliver the shipment to the next connecting line in good order. There must be a contract for through carriage to make the carrier liable beyond its own line, but such a contract is to be implied from the acceptance of the goods.

"There is really no great difference between the English and American doctrine on this subject," said the court, in Piedmont Manufacturing Co. v. Columbia & G. Railroad Company, 19 S. C., 353. "The one holds that, to exempt a carrier from liability beyond its terminus, there must be a special contract to that end. The other that, to make the first carrier responsible, there must be a special contract to that end. Both admit that the carrier is not bound to go beyond the terminus, but that he may do so; and if he undertakes to do so; he is bound by his undertaking. In the one case, if the contract contains no exemption, it is absolute; in the other, if conditions are specified, they must govern. This is nothing more than saying that the whole thing is per contract, and that whatever the contract is, that must be enforced—the legal construction being that in the one case, in the absence of exemptions, the

carrier has contracted unconditionally to deliver; the other, with conditions inserted, they must control.''

Of course, there is no room for an inference of a contract for through carriage when there is an express agreement limiting the carrier's undertaking to its own line, and it is not liable as a common carrier beyond that point.

A provision in a bill of lading that: ''said company agrees to carry to its usual place of delivery at said destination if on its road, otherwise to deliver to another carrier on the route to said destination,'' has been construed by some courts as an express limitation of the carrier's undertaking to one for carriage over its own line, especially when the contract also stipulates against liability for loss or damage not occurring on that carrier's line. 31 L. R. A. (N. S.), 58. But other courts have held, where the carrier agrees to a through freight rate and undertakes the carriage of a shipment consigned to a point beyond its own line, with the above quoted provision, that it was a through freight contract, where the car on which the shipment was loaded was treated as a through car and the shipment was carried to its final destination in the same cars in which it was received. See notes to 31 L. R. A. (N. S.), 58; Elgin J. & E. R. Co. v. Bates Machine Company, 200 Ill., 636, 93 Am. St. Reps., 218; Hachadoorian v. L. & N. Railroad Co., 128 Appeals Division, 171, 112 N. Y. Supp., 661; Atlanta Coast Line R. Co. v. Henderson, 131 Ga., 75, 61 S. E. 1111.

''We regard the contract in the case cited as a contract much more favorable to the appellant's position than is the one now before us. We are unable to find anything in the bill of lading which limits the liability to loss or damage occurring upon its own line. Neither the point of destination on appellant's road was mentioned in the contract, nor was the road to which appellant intended to deliver the car for carriage from its terminus to the point of destination mentioned, nor was the proportion of freight that was to be paid to appellant and to the connecting carrier stated. In fact, there was simply a through freight rate of fifteen cents per hundred-weight fixed. The undisputed evidence in this case shows that the car in which this wheel was loaded was treated by appellant as a through car, and, in fact, the wheel was sent therein to the point of destination, and there is no evidence tending to show that any other rule obtained with this company in shipping through freight that was to be delivered to connecting lines. We think Toledo, etc., Ry. Co. v. Merriman, 52 Ill., 123, 4 Am. Rep., 590, decisive of the case at bar.'' See Elgin J. & E. Railway Co. v. Bates Machine Co., supra.

We think, under the authorities that, this was an undertaking to carry the shipment to its ultimate destination, as the carrier accepted the shipment consigned to a point beyond its own line, in through cars, at a through freight rate, and agreed to carry to its usual place of delivery at the destination if on its road, otherwise to deliver to another carrier on the route to said destination, without in any way limiting its liability beyond its own line, hence, we think these cases are governed by the principles laid down in the case of Transportation Co. v. Bloch Brothers, supra; Railroad v. Weaver, 9 Lea, 38; 4 Elliott on Railroads (3 Ed.), sec. 2170; and notes to 31 L. R. A. (N. S.), 110.

In other words, where the initial carrier accepts freight consigned to a destination beyond its own line, in the absence of an express stipulation to the contrary, an undertaking to carry the shipment to its ultimate destination will be implied from the mere act of acceptance; and the agreement to deliver the freight to a connecting carrier in no way limits the initial carrier's undertaking to carry the shipment to its destination, and will not relieve the initial carrier from liability in the absence of an agreement expressly limiting such carrier's liability to its own line.

The proof showed that the sheep were delivered to the defendant in good condition and that those found dead at destination were bruised, but there is no positive proof that the loss resulted from the negligence of any one, but such proof is not necessary to entitle the plaintiffs to a recovery; for, "Where goods in the custody of a common carrier are lost or damaged, the presumption of law is that it was occasioned by default, and that the burden is upon it to prove that it arose from a cause for which it was not responsible." Transportation Co. v. Bloch Brothers, supra; Railroad v. Naive, 112 Tenn., 239, 79 S. W., 124; Railroad v. Stone & Haslett, 112 Tenn., 348, 79 S. W., 1031.

We think there was enough evidence to carry the case to the jury as there was proof that the sheep were "bruised up," and to warrant the jury in finding that the sheep received the injuries from which they died while on defendant's line, as the proof showed that the cars were delivered to the connecting line at the Terminals in the Kayne Avenue Yards and were transported on the same night only a short distance out to the Radnor Yards, where they remained until next morning, when they were then transported to destination. It was shown that nothing occurred in the switching operation between the two yards by which the sheep could have been injured, but there were dead sheep in the car next morning; hence it is evident they received the injuries in transit on the initial carrier's line. The fact that the terminal inspector reported no dead sheep is not

at all conclusive that the sheep had not previously received injuries from which they died during the night.

It results that the assignments of errors must be overruled, the judgment of the lower court is affirmed, and all the cost, including the cost of appeal, is adjudged against the railroad.

Faw, P. J., and DeWitt, J., concur.