NASHVILLE, C. & ST. L. RY. v. DAVIS.—114 S. W. (2d), 831.

Middle Section.   November 27, 1937.

Petition for Certiorari denied by Supreme Court, April 2, 1938.

Walton Whitwell, of Nashville, and Kingree & Kingree, of Shelbyville, for plaintiff in error Railway.

Zach T. Carney, of Shelbyville, for defendant in error Davis.

CROWNOVER, J. This is an action against a common carrier for damages for unreasonable delay in transportation of a car of cattle; and for damages for the death of one cow.

The plaintiff, T. Lynn Davis, shipped a carload of 25 cows and 19 calves from Wartrace, Tenn., to Jacksonville, Fla., by the Nashville, Chattanooga & St. Louis Railway. The cattle were 57 hours en route; 36 hours would have been a reasonable time. He sued for damages from shrinkage in the weight of the cattle and from the fall in their market value during the delay in arriving.

The suit originated in a justice of the peace court, where judgment was rendered for the plaintiff for $350.

On appeal to the circuit court the case was tried by the judge without a jury and he rendered judgment for the plaintiff for $275.

Motions for a new trial and in arrest of judgment were overruled, and the defendant appealed in error to this court and has assigned errors, which are, in substance, as follows:

(1) There is no evidence to support the judgment.

(2) The judgment is excessive.

(3) The damages are speculative and conjectural.

(4) The trial judge erred in rendering judgment for the plaintiff for the total amount of the damages, when it developed at the hearing that the plaintiff only owned a half interest in the livestock.

The facts necessary to be stated are as follows:

T. Lynn Davis, of Wartrace, Tenn., the plaintiff, was a dealer in cattle. For several years before this suit he had made shipments of cattle from Wartrace to other points by truck. An agent of the Nashville, Chattanooga & St. Louis Railway urged him to make shipments over that railroad. He consulted the local freight agent, Tidwell, in May, 1935, about shipping a carload of milch cows to Jacksonville, Fla. The agent estimated that the car would reach Jacksonville within 32 to 36 hours.

This time was satisfactory to Davis, as he wished the cattle to reach Jacksonville within 36 hours. Some of the cows were giv-

ing milk and some were due to have calves, and it was essential that the shipment be moved with reasonable dispatch.

The bill of lading provided that said livestock should be transported "with reasonable dispatch."

By federal statute railroads engaged in transporting cattle, etc., from one state to another are prohibited from confining the same in their cars for a longer period of time than 28 hours without unloading them for rest, water and feeding for a period of 5 hours; but it is provided that on the shipper's signing a written request the railroad may keep the cattle confined for as long as 36 hours without unloading for rest, water and feeding. Act June 29, 1906, 34 U. S. St. at L. 607, chapter 3594, 45 U. S. C. A., sections 71-74.

Davis signed a written request, or 36-hour release, as he did not want the cattle unloaded en route for fear they would be treated roughly by the stockyard employees.

The car was loaded at Wartrace on the night of May 14, 1935, with 25 Jersey cows and 19 Jersey calves, and was moved at 8:15 p. m. by the railroad's stock pick-up train.

The route was from Wartrace, Tenn., to Atlanta, Ga., over the Nashville, Chattanooga & St. Louis Railway; from Atlanta, via Macon, to Albany, Ga., over the Central of Georgia Railway; and from Albany, Ga., to Jacksonville, Fla., over the Atlantic Coast Line.

On the arrival of the car of cattle at Macon Ga., at 11:25 a. m. May 15, 1935, it was discovered that one cow was dead. The freight train for Albany was due to leave within 35 minutes (at 12:00). The car was taken from the train and sent to the stockyards in order that the dead cow might be removed. This caused the car to miss going out with that 12:00 train.

The Central of Georgia Railway operated only one regular daily train between Macon and Albany, but operated extra trains as the business demanded.

The cattle were unloaded at the stockyards, fed 8 pounds each of hay, watered, and left in the stock pens for 19 hours.

There are stock pens all along the line at every station. There are stockyards in Albany, not far from the switchyards.

The cattle were reloaded and the car carried from Macon on a special train at 6:30 a. m., on May 16, 1935. It arrived at Albany at 11:30 a. m., and was left there 7 hours and 20 minutes.

It reached Jacksonville at 4:45 a. m. on May 17, and was unloaded at 5:30 a. m.

The cattle had been en route 57 hours and 15 minutes, and had been fed only one time.

The cows were weak, some of them could hardly stand up. Two were down in the car. They were all skinned up. They looked as if they had been starved. They had depreciated in weight and in

appearance on account of going without food and water for such a long period.

They could not be placed on the market on the day they should have been, and were sold for less as the result.

One witness testified that when cattle get weak from lack of food and water they can't stand the vibration of railroad cars and get thrown about and bruised and skinned.

The trial judge found that the death of the one cow before the train reached Macon was not caused by the railroad's negligence, and his finding is not appealed from, hence that proposition has been eliminated.

If the 24 cows had been delivered in Jacksonville within about 36 hours, according to the schedule, and in the condition they would normally have been after 36 hours of transportation, without feed, their market value would have been $85 to $90 each. At $85 each they would have sold for $2,040. They actually brought $1,775.

This action was based upon the Carmack and Cummins Amendments to the Interstate Commerce Act of Congress, as amended, 49 U. S. C. A. section 20(11), imposing liability upon the inital carrier for loss, damage, or injury to goods while on the line of a connecting carrier (4 R. C. L. 907; Fourth National Bank v. N., C. & St. L. Ry., 128 Tenn., 530, 161 S. W., 1144; Drake v. Railroad, 125 Tenn., 627, 148 S. W., 214) and for delay (New York, P. & N. R. Co. v. Peninsula Produce Exch., 240 U S., 34, 36 S. Ct. 230, 60 L. Ed., 511, L. R. A. 1917A. 193).

1. The principal question for determination is whether there was an unusual delay, and, if so, was it excusable or due to negligence.

"In cases of delayed shipments there is no presumption of negligence unless the delay be so prolonged as to indicate negligence. The shipper in the absence of a time limit in shipment, must prove and the Court must find as a fact that the delay was unreasonable and occasioned by the negligence of the carrier." Louisville & N. Railroad Co. v. Brown, 1 Tenn. Civ. App., 269, 281; 10 C. J. 283, section 404.

It is the carrier's duty to forward freight without delay and as speedily as practicable; and if it be unnecessarily and negligently detained by him, he is liable for the loss. Lamont v. Railroad, 56 Tenn., 58, 9 Heisk. 58; 9 Am. Jur. 727, section 505.

But this means that the carrier is bound to deliver within a reasonable time in the absence of a special contract—according to the usual course of business, with all convenient dispatch. East Tennessee & G. Railroad v. Nelson, 1 Cold. 272; Baker v. Railroad, 10 Lea 304; 10 C. J. 284; 4 R. C. L. 737; N., C. & St. L. Ry. v. Produce Co., 12 Tenn. App., 609, 613. The law does not attempt to fix

by rule what is a reasonable time. Each case depends on its own peculiar circumstances. 4 R. C. L. 738; 10 C. J. 286.

The burden is on the shipper to show negligence. He must show by a preponderance of the evidence that this car of livestock was really delayed in transit longer than the usual and customary time for transportation. N., C. & St. L. Ry. v. Produce Co., 12 Tenn. App., 609, 614.

Proof of delivery in the usual time according to the custom and the course of the carrier's business is prima facie evidence of reasonable time. Southern Pac. Co. v. Arnett, 8 Cir., 126 F. 75; Lowe v. East Tennessee, etc., R. Co., 90 Ga. 85, 15 S. E. 692; Ecton v. Chicago, etc., R. Co., 125 Mo. App., 223, 102 S. W., 575; N., C. & St. L. Ry. v. Produce Co., 12 Tenn. App., 609, 612.

The trial judge found that the shipment was not handled with reasonable dispatch.

The evidence shows that the cattle might have been delivered within 34 hours but for the delay in Macon, Ga.

The railroad insists that it was necessary to move the dead animal at Macon; that the only way it could be moved was to send the car to the stockyards; that this prevented the car's being carried on by that train, which left within 40 minutes after its arrival; that there was not other train until the next day.

The defendant in error Davis' insistence is that it was not necessary to remove the dead animal at Macon; that it might have been carried on to Albany, Ga., a distance of 107 miles, where according to schedule the car would have to remain more than 2 hours, a sufficient time for the cow to be removed from the car.

A federal statute prohibits the shipment into another state of animals in which there is a dead animal. But Macon and Albany are in the same state of Georgia. The distance between the two towns is 107 miles, a distance which could be traveled by a freight train in about 4½ hours.

In view of the fact that the railroad company, through its agents, knew that prompt delivery of this shipment was essential, due to the fact that they were cows with calves and giving milk, we hold that it was an unreasonable delay to stop this car at Macon when there was no other train leaving in 19 hours, instead of allowing it to go on to Albany and have the dead cow removed there.

The car traveled from Wartrace, Tenn., to Macon, Ga., a distance of 336.1 miles, in 15 hours and 10 minutes, and there is no controversy as to this part of the journey. The contention is about the delay at Macon and from there to Jacksonville.

According to published schedules the car should have moved from Macon, Ga., to Jacksonville, Fla., on the following schedule:

Lv. Macon 12:00 noon, May 15, over Central of Ga. (after remaining in Macon 35 minutes).

Ar. Albany, Ga., at 4:30 P. M. May 15, (distance of 107 miles. En route 4 hours 30 min. Remained in Albany 2 hrs. 30 min.).

Lv. Albany at 7:00 P. M. May 15 over Atlantic Coast Line.

Ar. Waycross, Ga., 10:25 P. M. May 15 (distance of 111.8 miles. En route 3 hrs. 25 min.).

Lv. Waycross 3:30 A. M. May 16 (after remaining in Waycross 5 hours 5 min.).

Ar. Jacksonville, Fla., at 6:10 A. M. May 16 (distance of 75.4 miles. En route 2 hrs. 40 min.).

Therefore it should have reached Jacksonville in 18 hours and 10 minutes after arriving in Macon. This would have made the total time for the trip 33 hours 20 minutes.

The car actually traveled as follows:

Ar. Macon 11:25 A. M. May 15.

Lv. Macon 6:30 A. M. May 16 (Had remained in Macon 19 hours 5 min. Left on a special train. The regular train ran 5-1/2 hours later, at 12:00 noon).

Ar. Albany 11:30 A. M. May 16 (Distance of 107 miles. En route 5 hours. Remained in Albany 7 hours 20 min.).

Lv. Albany 6:50 P. M. over Atlantic Coast Line.

Ar. Waycross 10:35 P. M. May 16 (111.8 miles. En route 3 hrs. 45 min. Remained in Waycross 1 hr. 25 min.).

Lv. Waycross 11:50 P. M. May 16.

Ar. Jacksonville, Fla., 5:30 A. M. May 17 (75.4 miles. 5 hrs. 40 min. en route).

The total time from the car's arrival in Macon to its arrival in Jacksonville was 42 hours 5 minutes. Of this time 26 hours and 25 minutes were spent in Macon and Albany.

The total time from Wartrace to Jacksonville was 57 hours and 15 minutes.

When the train arrived in Macon at 11:25 on May 15th and it was discovered that a cow in the car was dead, the railroad company knew that there was no regular train, according to schedule, until 12 noon the next day, 24 hours later. The cow might have been removed from the car at the station within the 35 minutes before the train left, at 12; or the car might have been sent on to Albany, on the same Central of Georgia Railway. The published schedule showed that there was a stop at Albany of 2 hours and 30 minutes. Witnesses testified that there was a stockyard at Albany not far from the switchyards. And the plaintiff testified that a dead cow may be removed from a stock car within 10 minutes' time. This is not controverted.

The cows were kept at the stockyards in Macon 19 hours and then sent out on a special train which left at 6:30 a. m. May 16 (the regular train left at noon), which caused the car to be kept

at Albany 7 hours 20 minutes waiting for the regular train. This made a delay of 24 hours because of this stop at Macon.

The defendant argues in its brief that, since the law required that the cattle be rested and fed at the end of 36 hours, and the time required for the shipment was more than 36 hours, it was within its discretion to stop at Macon to feed them. But the testimony shows that the car was stopped at Macon for the purpose of removing the dead cow and no other; that the delay caused them to have to be fed; and that they would have arrived within 34 hours but for this stop.

The railroad officials knew better than anybody when that car was stopped at Macon that it must necessarily lay over more than 24 hours in Macon and Albany, when it could have carried the car on 107 miles to Albany and have saved time, as only 10 minutes' time was required to remove the cow. This could have been done at Albany before the car was delivered to the Atlantic Coast Line. There is no evidence that the dead cow would have injured the other cattle if carried on in the car to Albany.

The printed schedules of the freight trains were not filed; but according to the employees' testimony this delay could have been prevented.

We think the car was not transported according to the usual course of business, and that the delay was unreasonable and occasioned by the negligence of the carrier.

"When goods in the custody of a common carrier are lost or damaged, the presumption of law is that it was occasioned by his default, and the burden is upon him to prove that it arose from a cause for which he was not responsible." Merchants' Dispatch Transportation Co. v. Bloch Brothers, 86 Tenn., 392, 393, 6 S. W., 881, 889, 6 Am. St. Rep. 847; Railroad Co. v. Naive, 112 Tenn., 239, 79 S. W., 124, 64 L. R. A. 443; Railroad Co v. Stone & Haslett, 112 Tenn., 348, 79 S. W., 1031; N., C. & St. L. Ry. v. Sparkman, Petty & Jameson, 8 Tenn. App., 683, 689.

The foregoing quotation applies only to injuries to the livestock; but we hold that this judgment is supported by the preponderance of the evidence.

2 and 3. The judgment is not excessive. It is based on the undisputed evidence as to the difference in value of the cows had they been delivered within 36 hours and their value at the time of delivery.

It is insisted by the defendant railroad company that there is no evidence upon which the court could arrive at the damages with reasonable certainty; that the judgment was rendered upon surmise, speculation, and conjecture.

"It may be true that railroad transportation of livestock always, and inevitably, involves reduction in their weight, some lameness,

and even abnormal weakness; but that this is true, and that these effects incident to the nature of the subject-matter, and the manner of transportation, cannot be made the basis of a recovery in damages, where there has been no negligence on the part of the carrier contributing thereto, or aggravating the natural injuries resulting from car wear, and necessary deprivation of water and food, is not to say that where the carrier has been guilty of negligent delay, and subjected the stock to the injurious effects of such transportation for an unreasonable and unnecessary length of time, and in consequence thereof the stock has been injured, though only in this natural way, to a greater extent than would have been the case had the delay not occurred, the carrier would not be responsible for whatever increased damage the stock has sustained on account of the delay, though such damage may be purely incident to keeping the animals on the car. To the contrary, we do not doubt the liability of the carrier for all damage that is referable to a negligent prolongation of the transportation, through its natural effect upon the physical condition, . . . of the animals, whereby they are reduced in weight or strength more than they would have been, had prompt carriage and delivery been made.'' Richmond & D. R. R. Co. v. Trousdale, 99 Ala. 389, 13 So. 23, 24, 42 Am. St. Rep. 73.

''The measure of damages for injury caused by a negligent delay in transportation and delivery of livestock is the difference between the value of the animals at the time they should have been delivered in the condition they would have been in at that time, and their value when they were delivered in the condition they were in at that time; in other words, the damages are measured by the change in the condition of the stock wrought by the unreasonable delay, if such change has been wrought, plus any additional expense of keeping the stock necessitated by the delay. It may be conceded that this rule for measuring the loss sustained is not by any means accurate or entirely satisfactory, but it is the best available under the circumstances. In cases like this all that the shipper is entitled to is compensation for his loss resulting from the delay of the carrier in the shipment. It will be readily agreed that the amount lost is in most instances the depreciation in the fair market value of the stock resulting from the delay, but it is often troublesome to ascertain with reasonable certainty the amount of this loss.'' 9 Am. Jur. 739, section 518.

''Where cattle are injured during transportation . . . by reason of delay . . . the damages are the shrinkage in the weight of the cattle and from the fall in their market value during the delay in arrival, the latter being not too speculative or remote where the parties, at the time of contracting for the carrying of the cattle knew and contemplated that they were not to be sold,

until after arrival.'' The Caledonia, 157 U. S., 124, 15 S. Ct. 537, 39 L. Ed. 644.

''Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U. S., 359, 379, 47 S. Ct. 400, 71 L. Ed., 684, 691. Compare The Seven Bros. (D. C.) 170 F. 126, 128; Pacific Steam Whaling Co. v. Alaska Packers' Ass'n, 138 Cal. 632, 638, 72 P. 161.'' Story Parchment Co. v. Paterson Parchment Paper Co., 282 U. S., 555, 51 S. Ct. 248, 250, 75 L. Ed., 544; Walgreen Co. v. Walton, 16 Tenn. App., 213, 233, 64 S. W. (2d), 44.

Hence these two assignments are overruled.

4. The fourth assignment of error is that the court erred in rendering judgment in favor of the plaintiff, Davis, for the full amount of the damages, when the evidence showed he had only a half interest in the loss.

It developed during the hearing of the case that Hunt Jarman had bought several of the cows in the shipment, and had assisted Davis with the shipment and it had been agreed between them that the profits of the carload should be divided equally between them.

It appears that railroad company and the public, in so far as the record shows, knew nothing of Jarman's interest until he testified at the hearing.

It does not appear that they were general partners, but it seemed to be a particular partnership for this transaction, and that Jarman was a dormant partner, as the contract and shipment were made in Davis' name.

It was not necessary for Jarman to be joined as a plaintiff.

''In an action upon a firm contract, all the persons who were partners at the time it was made should be joined as plaintiffs, even after dissolution. . . . No one who is not either an actual or an ostensible partner should be joined with the actual partners.

''A dormant partner may or may not be joined as plaintiff in a suit, and the joinder or omission is no ground for abatement, nonsuit, or writ of error. In other words, dormant partners are always proper, but never necessary, parties plaintiff. Nominal part-

ners are proper, but not necessary, parties plaintiff. They may, but need not, be joined.

"Where the contract is made in the name of one partner, but for the benefit of the firm, all the partners should join as plaintiffs in an action thereon. . . . One partner may or must sue alone upon a contract made in his name in cases where an agent may or must sue upon a contract made for his principal. Where a contract is made with one partner in his individual capacity, he must sue alone thereon, although he may have in fact been acting for the benefit of the firm. When the firm occupies substantially the position of an undisclosed principal, the action may be brought either by all the partners jointly, or by the partners alone in whose name the contract was made." Shumaker on Partnership, 2d Ed., 242-243; Rowley on Partnership, section 798; Tennessee Procedure by Higgins & Crownover, section 298; 47 C. J., 961, section 476.

Hence this assignment must be overruled.

All the assignments of errors having been overruled it results that the judgment of the lower court is affirmed. A judgment will be entered in this court in favor of Davis and against the railroad company for $275, with interest from April 23, 1937, to the present. The costs of the cause including the costs of the appeal are adjudged against the railroad company and the sureties on its appeal bond.

Faw, P. J., and Felts, J., concur.